## GODDARD *v.* FOSTER.

1. A., at Valparaiso, was the agent, under an agreement of May 7th, 1849, of B., at Boston, who was sending him adventures and shipments of goods, he selling the goods and investing the proceeds in other merchandise consigned to B., who sold the return cargoes; keeping an account of the profit and loss. A. was to have one-quarter of the net profits of B.'s business, that he, A., "conducted to completion," but was at liberty to withdraw from the arrangement at any time, "by giving B. so much notice that any voyage he, B., may have commenced previous to receipt of such advice, shall receive the full benefit of all A.'s service to its final accomplishment."

On the 22d of February, 1850, A. wrote to B. that he had resolved to join a Valparaiso house, which he named, but added: "I will manage your business as usual until 31st December, which will afford you ample time

to make your arrangements for sending some one out, if you are inclined." B. received this letter May 29th, 1850, and *afterwards* loaded and dispatched a ship consigned to A., or " in his absence," to the house which he had mentioned as the one he had resolved to join. A. concluded the whole business of this voyage as he had done that of previous voyages; but it was not "conducted to completion" prior to December 31st, 1850.

*Held*, that A.'s letter of 22d February was to be taken as if he had said: " In the interval, before the arrival of any new agent to represent you, I will perform the same services for the new voyages *not covered by the contract of May 7th*, 1849, that I have rendered in the voyages covered by the contract, and that your new agent would perform he here;" and, accordingly, that for all services performed by him in regard to *this* voyage he was entitled to be paid what the services were reasonably worth.

2. The rule of law that the interpretation of written instruments is a question of law for the court, is applied with full force to agreements to be deduced from the correspondence of the parties, and the fact that the language of the letters containing the offer or acceptance is doubtful, does not relieve the court of this duty, or make the question one of fact for the jury. It is only where terms used are technical, or terms having a peculiar meaning in a particular trade or place, that the aid of the jury is invoked to ascertain their meaning.

3. Where interest is allowed, not under contract, but by way of damages, the rate must be according to the *lex fori*.

ERROR to the Circuit Court for the District of New York; the case being thus:

In June, 1843, G. J. Foster and W. W. Goddard entered into an agreement, in writing, under seal, by which Foster agreed to go to the west coast of South America, and there reside as Goddard's agent for five years, selling the outward cargoes, purchasing return cargoes, collecting and forwarding information, and attending to the business and dispatch of the defendant's ships, giving his whole time to the business, in consideration of one-tenth of the net profits at the end of the term, or $1000 per annum if the one-tenth of the profits amounted to less than that sum.

Under this agreement Foster went to the west coast of South America, and there resided during the five years, performing his part of the agreement, and at its expiration, in 1848, returned to Boston, where the parties made a new agreement in writing and under seal, dated May 7th, 1849,

by which Foster agreed to return to the west coast, upon a similar employment, *giving his whole time to Goddard's business* in consideration of " one-quarter of the net profits of Goddard's business in that trade, that he (Foster) shall have *conducted to completion*," to be paid to him on his return. This agreement provided that Foster was to leave in Goddard's hands his share of the profits under the former agreement; that Foster might withdraw from this arrangement, " which he is at liberty to do at any time, by giving said Goddard so much notice that *any voyage he may have commenced previous to receipt of such advice, shall receive the full benefit of all said Foster's services to its final accomplishment, and not otherwise."* It also provided that Goddard might " annul the agreement whenever he may choose to do so," and that Foster should be liable " to the full extent of his interest and means for all losses in the business, and for all risks and casualties attendant thereon."

Foster, under this agreement, returned to the coast and continued to transact the business required of him, and on the 22d of February, 1850, wrote to Goddard that he had determined to join the house of Alsop & Co. on the 1st of January, 1851.  In this letter he said:

" *I will manage your business as usual until the* 31*st of December*, which will afford you ample time to make your arrangements for sending some one out, if you be inclined."

On the 13th of April, 1850, Goddard replied:

" I am very glad to learn your decision to join the house, it being what I would have advised for your own interest."

Goddard's reply was received by Foster May 29th, 1850.

After sending this letter, Goddard loaded and dispatched from Boston the ship Harriet Erving, upon a voyage styled hereinafter " her third voyage."  She left Boston on the 21st of August, arrived at Valparaiso on the 8th of December, and sailed thence December 27th, for points on the coast, to complete her cargo, and thence to Boston.

From the inception of this voyage, Goddard advised Fos-

ter by letter of his intentions in relation to her outward and return cargoes, and instructed him fully as to what he, Foster, should do on the coast in relation to the same.

The cargo was consigned to Foster, " or, in his absence, to Alsop & Co."

When the ship sailed from Boston, Goddard instructed the captain by letter as follows :

" I wish you to proceed in her with all possible dispatch direct to Valparaiso, where my *agent*, Mr. G. J. Foster, or, in his absence, Messrs. Alsop & Co., will dispose of your outward cargo, provide for the wants, and direct your further movements."

Foster concluded the whole business of this voyage in the same manner in which he had done that of previous voyages, prepared and forwarded to Goddard a note or memorandum of cargo suitable to be sent to the coast, purchased and had in readiness for the ship her return cargo, and dispatched her from the coast, directed the sale of her outward cargo, and was in constant communication with Goddard in relation thereto.

He joined the house of Alsop & Co. on the 1st of January, 1851. At that time there had been sold of the outward cargo $96,000, and there was afterwards sold $150,000. The entire service had been performed, so far as the homeward cargo was concerned, and nine-tenths of his whole services in relation to the voyage had been performed.

After joining the house of Alsop & Co. he completed the business of the voyage by directing, as before, the sale of the remainder of the cargo. This was done with the knowledge of and, as it appeared, without objection on the part of the other partners in the house of Alsop & Co.

After joining the house, he sent a part of the cargo to other points on the coast for a better market, in the exercise of his discretion as Goddard's agent, as he had done with previous cargoes, which Alsop & Co. never did for any of their correspondents, unless expressly authorized. The sales between January 1st and June 30th, at Valparaiso and Lima,

amounted to $135,000, and the remainder, about $15,000, was sold during the years 1851, 1852, and 1853.

The sales of the outward cargoes and the purchases of the homeward cargoes were made by Alsop & Co., who advanced the necessary funds, and charged and received a commission therefor.

Foster advised Goddard, by private letter of February 25th, 1851, of the sales he was making of the outward cargo, and that he should work off part of the goods " through Callao," the port of Lima.

Alsop & Co. rendered accounts of the sales at Valparaiso and Lima to Goddard.

In November, 1851, one Erving arrived on the coast, to act as Goddard's agent in the same business, in subsequent voyages. He took no part in the unfinished business of this voyage.

Foster returned to the United States in 1856, when Goddard expressed himself perfectly satisfied with everything he had done in his business.

On the 1st of May, 1857, Foster filed a bill in equity against Goddard in the Circuit Court for the District of Massachusetts, for an account, and to recover his share of the profits under the two agreements of 1843 and 1849. Goddard having appeared and answered, a decree for an account was entered, and an account was taken before a master. Upon that accounting Foster claimed, under the agreement of May 7th, 1849, a quarter of the profits of the voyage of the Harriet Erving, on the ground that by a subsequent agreement of the parties, shown by their correspondence, it was to be considered as included in that agreement, and that it was substantially brought to a completion before January 1st, 1851. The master so decided, and reported as due to Foster for his share in the profits of this voyage, $21 943. Upon exceptions to the master's report, the circuit judge disallowed this item,* holding that this voyage of the Harriet Erving was not covered by the agreement between the parties of

* 1 Clifford, 158.

May 7th, 1849, and upon appeal this court affirmed (and upon the same ground) the final decree, whereby this item was disallowed in that suit.* Goddard satisfied the final decree in that suit.

In this state of things Foster sued Goddard in *assumpsit* for services rendered by him in this voyage of the Harriet Erving.

The first count was on a special agreement to pay one-fourth of the profits of the outward and homeward voyages, being $23,600.44, with interest from March 1st, 1858.† The second, on a promise to pay a reasonable compensation. The third, on a promise to pay a reasonable compensation for services to January 1st, 1851. The fourth and fifth counts were the common counts of *indebitatus assumpsit* and *quantum meruit.* The damages were laid at $50,000.

The plea was the general issue with notice of defences:

1. A former recovery by the same plaintiff against the same defendant in the suit in equity in the Circuit Court for the District of Massachusetts, brought for an account under the agreement between the parties of May 7th, 1849, and that the defendant's services, if any, now sued for, were rendered under that agreement.

2. The statute of limitations.

Pursuant to the notice the defendant offered in evidence the record in the equity suit as a bar to the pending action, but the court rejected the evidence.

He also offered the same record in evidence as a bar to all claim in the action for services rendered for him before the close of the year in which the plaintiff had given notice of his withdrawal from the second written agreement. But the court rejected the evidence as inadmissible even for that purpose.

Evidence was offered by the plaintiff of the value of his services, to which the defendant objected, insisting that the services of the plaintiff in respect to that voyage, if any, were rendered under the written agreement, but the court

---

* 1 Black, 506.   † This count was ruled out and abandoned at the trial.

ruled that the services shown were outside of that agreement, and admitted the evidence.

To all these rulings the defendant excepted.

The court having charged that neither party was to suffer in any way from the lapse of time, and thus disposing of the plea of the statute of limitations, charged further among other things—

1st. That the plaintiff could not recover under the first count of the declaration, nor any part of the profits of the voyage.

2d. That the plaintiff was entitled to recover such sum as upon the evidence the jury might regard to be the reasonable *quantum meruit* value of his services.

The court added:

"That includes a consideration by you of what his services were, the entire scope of the trade, and Mr. Foster's qualifications for those services at the time he rendered the services in reference to this voyage, and the consideration of how much these services were in bulk or in value before the 1st of January, 1851, and the consideration of the extent of these services after that date, and whether they are to be diminished after by any payment or allowance which ought to be charged against Mr. Foster because of any compensation he may have received as a member of the firm of Alsop & Co. The whole question is one of fact for you to pass upon as men of judgment and intelligence, and upon the evidence, applying your best faculties to it.

"If you arrive at any sum which you regard as proper for the value of these services, then Mr. Foster is entitled to interest on that sum at the rate provided by law of New York, 7 per cent. per annum, from the time of the commencement of this suit."

3d. That there was an agreement between the parties for the rendering of some service distinct and independent from that of May 7th, 1849; that that agreement as matter of law, as one drawn from correspondence between the parties, the jury were bound to find, and that there was an agreement between the parties for the performance, by Mr. Foster, of such services as he rendered in respect of the third

voyage of the Harriet Erving, to be compensated for at such rates as these services reasonably deserved.

To the second and third of the charges, as above given, the defendant excepted; no exception being taken by either party to the first. The jury found for the plaintiff $29,407, and the defendant brought the case here for review.

The reader has doubtless seen that, throwing out the question how far the meaning of the old contract had been settled by the decision in the equity suit in the Circuit Court for Massachusetts, and the question of interest, there were really but two questions in the case.

I. What did the agreement as made by the correspondence (Foster's letter of February 22d, 1850, and Goddard's reply, being chief features in it) mean?

Did it mean, as Goddard, the defendant, insisted, that Foster would perform all the duties required by the old contract on the terms and for the compensation specified in *it*, that is to say, would perform them *under that contract;* a construction which, as this old contract gave nothing but for "business conducted to completion," would give nothing for any service performed before December 31st, 1850, as the voyage in question was not so conducted, to a conclusion, before that date; while for any service performed after that date the argument was susceptible of being made that all that the plaintiff did he did as a member of the firm of Alsop & Co., and was paid by the commission given to that house.

OR, as Foster contended it was, was the meaning of the agreement as if he, Foster, had written—

"In the interval, before the arrival of any new agent to represent you, I will perform the same services for the new voyages, not covered by the contract of May 7th, 1849, that I have rendered in the voyages covered by the contract and that your new agent would perform were he here?"—

a construction which would naturally imply that the new services were to be paid for at such reasonable rates as they were fairly worth.

II. Was the question "whether there was an agreement

between the parties, shown by the correspondence, for the rendering of the services in question, distinct and independent of the agreement of May 7th, 1850, a question of law to be determined by the court, or a question for the jury?"

*Mr. D. D. Lord, for the plaintiff in error :*

I. As to the services rendered prior to the 31st of December, 1850.

1. The letter of 22d February fixed the termination of the old contract for the 31st December, not only without notice that any services rendered in the interval were to be excluded from its terms, but with the express assurance that the business (including, of course, all of it) would, during this term, be managed " as usual."

Even though the plaintiff could not share in the profits of this voyage of the Erving, he was, nevertheless, bound by his contract to attend to all her business. The terms of his contract expressly obliged him to attend to all business, and excluded him from the profits of such as he did not complete. To imply an agreement to pay for such services rendered under the contract, because the contract itself provided no such compensation for them, is virtually to set that contract aside. The contract was, when made, very advantageous for the plaintiff. He could easily protect himself against any casual disadvantage caused by the late arrivals of new adventures, by the fixing, as he had a right to do, the time and terms of his withdrawal. But the chance of any loss from this provision was compensated by the large share allowed on completed business; it was more than double his compensation under the agreement of 1843.

All Foster's services were rendered to the Erving without authority, instruction, or notice from the defendant, except such as was to be inferred from the contract itself; and he must have understood that these services were rendered in performance of the agreement of 7th May, 1849; because, in his former action on this contract, the bill in equity, he made them the ground of a claim for a share in the profits of the adventure.

If the notice of 22d February is susceptible of a construction limiting the plaintiff's duties to adventures previously commenced, it is at least equally capable of 'a construction binding him to manage all the defendant's business on the terms of the contract; and as the plaintiff might have avoided the ambiguity, this latter construction should be adopted.

2. The sale of so much of the Erving's outward cargo as was made after 31st December, was not a service for which the plaintiff can claim any compensation, beyond what was due to the firm of which he had become a member. Alsop & Co. had accepted a consignment of the cargo, and this acceptance entitled the defendant to the full services of every partner in the house. If the plaintiff, after becoming a partner, had the exclusive charge of these sales, it was only as attending to that branch of business of the house; he is not shown to have rendered any services in disposing of that part of the cargo which was sold at Valparaiso, which he did not perform in reference to other consignments from other parties. But, however special or valuable his services may have been, they did not exceed his duties under his newly assumed office of consignee, and were compensated by the large commission paid to Alsop & Co., in which he participated. To assume that he was acting in a merely personal capacity, as agent of Goddard, would be to suppose that he was acting contrary to his letter of 22d February, and contrary to his obligations to his new house.

II. The court took from the jury the decision of the point whether a contract different from the old one existed. The matter depended on a correspondence, and on various facts of whose effect the jury was the judge.

*Mr. W. M. Evarts, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Compensation for services rendered by the plaintiff, as agent for the defendant in conducting a certain commercial adventure at his request and for his benefit, is claimed by

the plaintiff in the present suit, which is an action of assumpsit for the value of the services rendered.

Prior services of like kind, in transactions of a similar character, had been rendered by the plaintiff for the same defendant, to which, though not embraced in this suit, and to the litigation which grew out of the same, it becomes necessary to advert in order to a clear understanding of the present controversy.

Those prior transactions had their origin in two written agreements between the parties. By the first agreement, dated June 24th, 1843, the plaintiff engaged, among other things, to proceed at once to Valparaiso, and there to remain for the term of five years, and to devote himself, for the whole time, exclusively to the business of the other party, such as the sale and purchase of cargoes, collecting freight-moneys, procuring return freights, eliciting orders for the purchase and shipment of goods, effecting the sale of vessels, and collecting and forwarding all such information as he could obtain respecting the trade. In consideration of which the defendant engaged that he, the plaintiff, shall, at the expiration of five years, be entitled to one-tenth of the net profits of his business in that trade, subject to certain deductions for interest, cost, and expenses, as therein specified. Under that agreement the plaintiff proceeded to Valparaiso, where he continued to reside during the period prescribed, and well and truly performed all things required in the agreement. Having performed the agreement, the plaintiff returned to Boston, where the defendant resided, and on the 7th of May, 1849, they entered into the second agreement, in which the plaintiff engaged to proceed at once to the west coast of South America, and to devote his whole time in those parts, as also in Mexico and California, exclusively to the management of the business of the defendant in those countries, such as the sale and purchase of merchandise, or any other property, collecting freight-moneys, procuring freights and consignments of goods, eliciting orders for the purchase and shipment of property, investing money, drawing and negotiating bills of exchange, and for-

warding all such information as he could obtain respecting
the trade.    In consideration of which the defendant engaged
that he, the plaintiff, "shall, on his return, be entitled to
one-fourth of the net profits of his business in that trade,
that he (the plaintiff) shall have conducted to completion,"
subject to certain deductions for interest, and all costs and
expenses incurred, both at home and abroad, in prosecuting
the business, including port charges and the expense of sail-
ing and keeping in repair the vessels employed, the defend-
ant having the right to purchase, charter, freight, and sell
the vessels designed for the trade at his option, charging or
crediting in the general account the profit or loss in every
such transaction.    What funds the plaintiff had, less two
thousand dollars, he engaged to leave in the hands of the de-
fendant, which he agreed not to abstract, nor any portion
of the profits, "until he shall see fit to withdraw from the
present arrangement, which he is at liberty to do at any
time by giving the defendant so much notice that any voy-
age he may have commenced, previous to the receipt of
such advice, shall receive the full benefit of all of the plain-
tiff's service to its final accomplishment, and not otherwise."
Pursuant to the agreement the plaintiff proceeded without
delay to the place designated, and conducted the described
business until the twenty-second of February of the next
year, when he gave the required notice to take effect at the
close of the year; and that on the first of January of the
succeeding year he should join the house of Alsop & Co.;
and he asked for an account.    On the thirteenth of April of
the same year, the defendant acknowledged the receipt of
the letter written by the plaintiff, giving the required notice,
approving the decision the plaintiff had made to join that
house, and promised to comply with his request "as speedily
as possible."

    Briefly described, the general mode of conducting the
business under each agreement was by adventures and ship-
ments of goods, procured at Boston by the defendant and
consigned to the plaintiff, by whom the merchandise was
sold and the proceeds invested in other merchandise which

was consigned to the defendant, who sold the return cargoes, and he kept the books and vouchers, showing the exact profit or loss on each adventure.

Large profits were earned in the business, and at the expiration of the period limited for the continuance of the agreement, a large sum was due to the plaintiff in the hands of the defendant, where it had been allowed to remain without his rendering any account. Repeated requests for an account having failed to secure one, the present plaintiff, on the first day of May, 1857, instituted a suit in equity in the Circuit Court for the District of Massachusetts, and the cause having proceeded to final hearing, and the court having entered a decretal order in favor of the plaintiff, sent the cause to a master to ascertain what the plaintiff was entitled to recover. He made a report in which he allowed, among other matters, the claim embraced in the present suit.

Ten exceptions were filed by the present defendant to that report, but it will not be necessary to refer to any one of them, except the tenth, which is substantially as follows : For that the said master has allowed the complainant one-fourth of the profits made by the respondent in the use and employment of a vessel called the Harriet Erving and her cargo during her third voyage, which was not sought to be recovered by the complainant in his or'ginal or amended bill, nor was the vessel or cargo or the profits resulting therefrom during the said voyage, embraced in the said second agreement, nor in any contract or agreement made by the respondent with the complainant, but were solely and exclusively at the profit and loss of the respondent.

Two of the objections taken to the finding of the master in respect to that voyage, as expressed in that exception, were sustained by the Circuit Court: (1.) That the voyage was not within the written agreement, as it was not commenced when the plaintiff gave the notice of his intention to withdraw from the arrangement nor when the defendant, on the thirteenth of April following, acknowledged the receipt of the notice and expressed his approval of the step taken by the plaintiff. (2.) That the proofs were not sufficient to

warrant the conclusion that the parties ever agreed that this voyage should be settled and adjusted within the principles of the written agreement; and if they did so agree, that there was no proper allegation in the bill to support such a decree.

Governed by those views the Circuit Court sustained the exception to the report allowing the claim, and on appeal to this court the decree of the Circuit Court sustaining the same was affirmed.*

Payment of the claim being refused, the plaintiff, on the fourteenth of August, 1862, instituted the present suit in the Court of Common Pleas for the city and county of New York, where he resides, to recover compensation for his services rendered in respect to that voyage, and the defendant, being a citizen of the State of Massachusetts, removed the cause into the Circuit Court for the first-named district. By the record it appears that the declaration contained a count on a special agreement to pay one-fourth of the profits earned by the ship on the voyage not adjusted in the prior suit, but it will not be necessary to remark upon that count, as the court ruled and instructed the jury that the plaintiff could not recover under that count, nor for any part of the profits of the voyage. Apart from that the declaration also contained four other counts, of which the second and third alleged a promise to pay a reasonable compensation for the services rendered, and the fourth and fifth were the common counts of *indebitatus assumpsit*, and *quantum meruit*. Service was made and the defendant appeared and pleaded the general issue, and gave notice that he would give evidence of a former recovery by the plaintiff against the defendant in the said suit in equity in the Circuit Court, founded upon the written agreement, and that the services of the plaintiff, if any, as claimed in the suit, were rendered under the same agreement. He also gave notice that he would give evidence to prove that the alleged causes of action did not accrue within six years next before the commencement of the action.

---

* Foster *v.* Goddard, 1 Clifford, 158, 183; Same Case, 1 Black, 506–514.

Testimony was introduced on both sides, and the jury, under the instructions of the court, returned a verdict in favor of the plaintiff for the sum of twenty-nine thousand four hundred and seven dollars and thirty-seven cents, and the defendant excepted and removed the cause into this court. Exceptions were taken by the defendant both to the rulings of the court in admitting and rejecting evidence, and to the refusal of the court to instruct the jury as requested by the defendant, and to the instructions which the court gave to the jury at the request of the plaintiff. Pursuant to the notice given by the defendant he offered in evidence the record in the equity suit as a bar to the pending action, but the court rejected the evidence and the defendant excepted. He also offered the same record in evidence as a bar to all claim in the action for services rendered for the defendant before the close of the year in which he gave the notice of his withdrawal from the second written agreement, but the court rejected the evidence as inadmissible even for that purpose, and the defendant excepted to the ruling. Evidence was offered by the plaintiff of the value of his services, to which the defendant objected, insisting that the services of the plaintiff in respect to that voyage, if any, were rendered under the written agreement, but the court ruled that the services shown were outside of that agreement, and admitted the evidence, to which the defendant excepted.

Evidently these three rulings depend upon the same considerations, and they present one of the most important questions involved in the bill of exceptions. Valuable services were rendered by the plaintiff in relation to that adventure. Conceding that, still it would follow, if, by the true construction of the instrument, he was required to perform the services under that agreement, that the record of the former suit between the parties is a bar to the present action. Both parties admit that proposition, but if the written agreement by its true construction did not require him to render the services in question, then the record of the former suit is no bar, because in that view of the case the

services rendered and for which compensation is sought in the present action were not in issue in the prior litigation, as the causes of action in the two suits are wholly distinct.

Enough has already been remarked to show that the defendant himself was of the opinion in the former suit that the services were not rendered under the written agreement, and that the Circuit Court came to the same conclusion, which was in all things affirmed by this court. Much discussion of the question, therefore, would seem to be unnecessary, as the better opinion is that the question is conclusively settled by the decree in the last-named case. Suppose, however, the question is an open one and is unaffected by those decisions, still the court is of the opinion that the view taken by the defendant in his exception to the master's report in the former suit is correct.

By the terms of the written agreement it is very clear that the plaintiff was not required to render any service in any voyage to be commenced after the receipt by the defendant of the notice of the plaintiff withdrawing from the arrangement, as more fully appears from the mode prescribed of giving the notice, and its effect, as stipulated in the instrument. Such funds as the plaintiff had, less $2000, he was to leave in the hands of the defendant, and the stipulation was that he should not abstract those funds, nor any portion of his profits, until he should see fit to withdraw from the arrangement, which he was at liberty to do at any time by giving the defendant so much notice that any voyage "he may have commenced, previous to the receipt of such advice, shall receive the full benefit of all the plaintiff's services to its final accomplishment." Voyages commenced before the notice of withdrawal was given were within the agreement, whether the vessels had arrived at their port of destination or not, but the plaintiff was not required to render any service under that agreement in relation to voyages projected subsequently, as he was to have no interest in such adventures, not being entitled to any part of the profits nor compelled to share in the loss. One-fourth of the profits of the business "conducted to completion" belonged to the

plaintiff, and in respect to all such voyages he was liable, "to the full extent of his interest and means, for all the losses that may be made in the business, as also for all the risks and casualties attendant thereon."

Taking these two provisions of the agreement together, it is quite clear that the former decisions in the equity suit were correct, as they show that the plaintiff was allowed to withdraw at any time, on giving the required notice, subject to this reasonable and necessary limitation, that as he was to be compensated by a share in the profits of the adventures the required notice should be such that he would remain long enough to complete the business in every voyage from which his compensation was to come.   Where profits were made in a voyage, conducted to completion, he was entitled to one-fourth of the profits, but if the voyage resulted in a loss, he was liable to the full extent of his interest and means for his proportion of the same, showing very plainly that his agency under the written agreement was limited to voyages commenced before the notice was given, as no one, it is presumed, will contend that he was required to render services without compensation, and to be liable for a share of the loss in an adventure in which he had no interest.

Opposed to this view is the suggestion that the plaintiff agreed to devote his whole time to the business, but the court is of the opinion that the word business, as used in that connection, must be limited to the period of the full employment of the plaintiff before the notice of withdrawal was given, as his undertaking subsequent to that notice was merely to conduct the business, meaning the business of the voyages previously commenced, to completion, or, as expressed in the phrase describing the character of the notice to be given, that he shall give " so much notice that any voyage he, the defendant, may have commenced previous to the receipt of such advice, shall receive the full benefit of all the plaintiff's services to its final accomplishment."

Viewed in the light of these suggestions, it is plain, we think, that the word business, as used in the first clause of

the agreement, was not intended to have any larger or different meaning from the other parts of the instrument which describe, in detail, the nature of the services he was required to perform. Sufficient has been remarked to show that the exceptions under consideration must be overruled.

Instructions were also given by the court to the jury in respect to the right of the plaintiff to recover upon the other counts, to many of which the defendant also excepted. Those deemed material to be noticed in this connection, are in substance and effect as follows: (1.) That the plaintiff could not recover under the first count of the declaration, nor any part of the profits of the voyage. (2.) That he might recover reasonable compensation under the other counts for such services as he rendered, if he satisfied the jury by the evidence in the case that he was employed by the defendant to perform service in respect to that voyage, by an agreement distinct and independent of the said written agreement, and that the jury, if they find for the plaintiff, should allow interest upon the amount at 'the rate of seven per cent. from the commencement of the suit. (3.) That the evidence of the agreement, consisting of correspondence. between the parties, the question whether it amounts to an agreement or not is a question of law, and that the court instructed the jury that there was an agreement between the parties for the performance by the plaintiff of such services as he rendered in respect to the voyage in question, to be compensated for at such rates as those services reasonably deserved.

Before examining the instructions, some brief reference must be made to the evidence. In the letter giving notice of his intention to withdraw from the arrangement, the plaintiff stated that he would manage the business of the defendant until the close of the same year, and it appears that the defendant subsequently loaded and dispatched the ship, whose third voyage is in question, consigning her to the plaintiff. She left Boston on the twenty-first of August, arrived at Valparaiso on the eighth of December, and sailed thence on the twenty-seventh of the same month for Co-

quimbo and other points on the coast to complete her cargo, and thence returned to Boston, her port of ultimate destination.

From the inception of the voyage, the defendant advised the plaintiff by letter of his intentions in respect to her outward and return cargoes, and instructed him fully as to what he, the plaintiff, should do on the coast in relation to the adventure. He consigned the cargo to the plaintiff, or, in his absence, to Alsop & Co., as appears by the bill of lading, and when the ship sailed he instructed the master to proceed with all possible dispatch direct to Valparaiso, informing him that the plaintiff, as his agent, or, in his absence, the firm named in the bill of lading, would dispose of the outward cargo, provide for the wants of the ship, and direct his further movements.

Suffice it to say the plaintiff concluded the whole business of the voyage in the same manner as he had conducted the business of previous voyages,—that is, he prepared and forwarded to the defendant a memorandum for a cargo suitable to be sent to that market, purchased and had in readiness for the ship her return cargo, and dispatched her from the coast and directed the sale of her outward cargo, and was in constant correspondence with the defendant in relation to the adventure from its inception to its final consummation.

Error is assigned as to the second and third instructions.

1. Argument to show that the second is correct is hardly necessary, as it is quite clear that the plaintiff is entitled to recover a compensation for his services, if he proved that the services were rendered at the request of the defendant under some agreement wholly distinct from the written agreement embraced in the prior litigation. *Indebitatus assumpsit* is founded upon what the law terms an implied promise on the part of the defendant to pay what in good conscience he is bound to pay to the plaintiff, consequently where the case shows that it is the duty of the defendant to pay, the law imputes to him a promise to fulfil that obligation.*

---

* Curtis *v.* Fiedler, 2 Black, 478.

2. Next error assigned is that the court erred in charging the jury that the correspondence showed an agreement between the parties distinct from the prior written agreement which was litigated in the equity suit, but the court is of the opinion that the charge was correct, as it is well-settled law that written instruments are always to be construed by the court, except when they contain technical words, or terms of art, or when the instrument is introduced in evidence collaterally, and where its effect depends not merely on the construction and meaning of the instrument, but upon extrinsic facts and circumstances, in which case the inference to be drawn from it must be left to the jury.* Where the question was whether there was a contract between two parties to be deduced from correspondence, Parke, Baron, said: "The law I take to be this: that it is the duty of the court to construe all written instruments. If there are peculiar expressions used in the instrument, which have, in particular places or trades, a known meaning attached to them, it is for the jury to say what is the meaning of those expressions, but it is for the court to decide what is the meaning of the contract." Contracts are frequently made by correspondence between the parties, and in such a state of the evidence it was held, in the case of *Begg* v. *Forbes,*† that the question was exclusively for the court; Jervis, C. J., remarking, "Surely the construction of written documents is for the judge, whether many or few in number." Exceptional cases arise where the contract rests partly in the correspondence and partly in oral communications, in which it is held that the question whether or not there is a contract is a question for the jury.‡ Courts of justice, however, are not denied the same light and information the parties enjoyed when the contract was executed, but they may acquaint themselves with the persons and circumstances that are the subjects of

---

* Levy *v.* Gadsby, 3 Cranch, 186; Bliven *v.* N. E. Screw Co., 23 Howard, 432; Etting *v* The Bank, 11 Wheaton, 75; Barreda *v.* Silsbee, 2 Black, 168.

† 30 English Law and Equity, 508.

‡ Bolckow *v.* Seymour, 17 C. B. (N. S.), 107; Barreda *v.* Silsbee, 2 Black, 168.

the statements in the written agreement, and are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and of the correct application of the language to the things described.*

Proof of service at the request of the defendant was full and uncontradicted, and the Circuit Court instructed the jury that the plaintiff was " entitled to recover in the case such sum as the reasonable *quantum meruit* value of his services, upon the evidence, you may regard to be proper;" adding that the instruction "includes a consideration by you of what his services were, the entire scope of the trade, and his qualifications for those services at the time he rendered the same, in reference" to that voyage, and the consideration of how much those services were in bulk or in value before the close of the year, and the consideration of his services after that date, and whether they are to be diminished after by any payment or allowance which ought to be charged against the plaintiff on account of any compensation he may have received as a member of the firm to which he belonged; and stating, in conclusion, to the effect, that the court left the whole case to the jury as a question of fact for their determination.

Most of the other exceptions to the charge of the court are shown to be without merit, by that instruction, which submitted the whole evidence to the jury.

Beyond all question the plaintiff was entitled to interest from the commencement of the suit, and it is not perceived that there is any error in the rule prescribed as to the rate, as it is the rule of the *lex fori*, especially as no rate is fixed in the contract and no place designated for its performance.

Separate examination of the numerous other exceptions as to the ruling of the court, in admitting and rejecting evidence, will not be attempted, as none of them are of any

---

* Shore *v.* Wilson, 9 Clarke & Finelly, 569; Addison on Contracts, 846; Blossom *v.* Griffin, 13 New York, 569; O'Neill *v.* James, 43 Id. 84–92.

general importance.  Suffice it to say they have all been examined and the court is of the opinion that they must severally be overruled, and that there is no error in the record.

JUDGMENT AFFIRMED.

Mr. Justice STRONG dissented from this judgment and from the preceding opinion respecting the construction and legal effect of the written agreement between the parties.

Mr. Justice HUNT also dissented.