### GENERAL MOTORS CORPORATION v. ABELL.

(Circuit Court of Appeals, First Circuit.   October 19, 1923.)

#### No. 1619.

1. Contracts ⚖176(1)—Construction of written Instruments is for the court.

Where a contract is to be determined from written instruments alone, without the aid of extrinsic testimony, their construction is for the court, and it cannot delegate that duty to the jury.

2. Contracts ⚖32—Letter held not such acceptance of option as to create binding contract.

By a writing plaintiff agreed "to enter into a contract" with defendant "at such time as the latter shall in writing request," giving it a nonexclusive license to use an invention on terms involving payment of large minimum royalties. Held, that a letter written on behalf of defendant, stating that it "will be glad" to take a license in accordance with the agreement and asking plaintiff to have his counsel "submit a form of license for our consideration," was not such an acceptance of the option as to create a binding contract, but left defendant free until the requested license contract was submitted to and duly executed by it.

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

⚖For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action at law by Rollin Abell against the General Motors Corporation. Judgment for plaintiff, and defendant brings error. Reversed.

Weld A. Rollins, of Boston, Mass. (John Thomas Smith and Frank A. Gaynor, both of New York City, on the brief), for plaintiff in error.

Hugh D. McLellan and Joseph Wentworth, both of Boston, Mass. (Richard C. Curtis and Choate, Hall & Stewart, all of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. Abell sued for defendant's breach of an alleged contract to take a nonexclusive license to use plaintiff's patented invention. The contract declared upon consisted of two papers, plus an alleged waiver "by mutual assent of the parties" of the October 16 time limit stated in the first paper. These documents were as follows:

"This agreement. made this 24th day of June, 1919, by and between Rollin Abell, of Milton, county of Norfolk and commonwealth of Massachusetts, party of the first part, and the General Motors Corporation, a corporation duly established and existing under the laws of the state of Delaware, the party of the second part, witnesses:

"Whereas, the party of the first part has invented a certain valve mechanism covered by application bearing serial No. 30,549, which application was allowed by the United States government on October 29, 1918; and

"Whereas, there is a possibility that the party of the second part may desire to use said invention in connection with the engines manufactured by it, it is agreed between the parties as follows:

"1. The party of the second part grants to the party of the first part the use of its facilities for the purpose of experimentation with said valve mechanism, in order that the party of the second part may decide whether it desires to use said mechanism on its automobile engines; and the party of the second part agrees to pay all expenses of the said experimentation, including as part of said expense the payment of two thousand (2,000) dollars a month and his traveling and hotel expenses to the party of the first part. The party of the first part undertakes and promises to give such time to the experimentation as may be reasonably necessary for the proper progress of the work. This period of experimentation shall begin forthwith and end November 1, 1919.

"2. The party of the first part agrees to enter into a contract with the party of the second part, at such time before October 16, 1919, as the latter shall in writing request, which contract shall provide either:

"A. For a nonexclusive license to the party of the second part for the use of said invention on automobile engines in connection with its own production, said contract for a nonexclusive license to contain a provision that in each year the party of the second part shall pay at the rate of one ($1) dollar per engine for the first fifty thousand (50,000) engines equipped with said mechanism; at the rate of eighty-seven and one-half cents (87½c) for the next fifty thousand (50,000) engines so equipped in one year; at the rate of seventy-five cents (75c) for the next fifty thousand (50,000) engines so equipped; at the rate of sixty-two and one-half cents (62½c) for the next fifty thousand (50,000) engines so equipped; at the rate of fifty cents (50c) for the next fifty thousand (50,000) engines so equipped; at the rate of thirty-seven and one-half cents (37½c) for the next fifty thousand (50,000) engines so equipped; and at the rate of twenty-five cents (25c) per engine on which said invention or any part thereof is used in excess of three hundred thousand (300,000) in any such year. Such contract to contain a provision that in each of the first three (3) years, the annual payment shall in no event be less than

fifty thousand ($50,000) dollars. Said license to be applicable to automobile engines, and to be nonassignable and nontransferable. The provisions of such contract as to methods and time of monthly payments and other provisions for the proper and reasonable protection of parties to be such as may be agreed upon, if the party of the second part should decide to take up this option. Or

"B. For an exclusive license to the party of the second part for the use of said invention in connection with its own production of automobile engines, said contract for an exclusive license containing a provision that in each year the party of the second part shall pay at the rate of two ($2) dollars per engine for the first fifty thousand (50,000) engines equipped with said mechanism, or any part thereof; at the rate of one dollar and seventy-five cents ($1.75) for the next fifty thousand (50,000) engines so equipped in one year; at the rate of one dollar and fifty cents ($1.50) for the next fifty thousand (50,000) engines so equipped; at the rate of one dollar and twenty-five cents ($1.25) for the next fifty thousand (50,000) engines so equipped; at the rate of one dollar ($1) for the next fifty thousand (50,000) engines so equipped; seventy-five cents (75c) for the next fifty thousand (50,000) engines so equipped; and at the rate of fifty cents (50c) per engine on which said invention or any part thereof is used in excess of three hundred thousand (300,000) in any such year. Said contract to contain a provision that in each of the first three years the annual payment shall in no event be less than one hundred thousand dollars ($100,000): Provided, that any amounts in excess of said minimum of one hundred thousand dollars ($100,000) per year due and payable on account of engines actually produced shall be abated until the minimum royalty paid for this exclusive license be reduced to fifty thousand dollars ($50,000) per year during the nonproductive period intervening between the conclusion of experimentation and the beginning of actual production. It is agreed, however, that such abatement for the nonproductive period shall not exceed in total more than fifty thousand dollars ($50,000). Said license to be applicable only to automobile engines, and to be nonassignable and nontransferable, and to become nonexclusive at such time after three years as the amount of royalties paid in any one year shall fall below one hundred thousand ($100,000) dollars. The provisions of such contract as to methods and time of monthly payments, and the other provisions for the proper and reasonable protection of parties to be such as may be agreed upon if the party of the second part should decide to take up this option.

"3. It is further agreed that the party of the first part, being already committed to grant nonexclusive licenses to the Trego Motors Corporation, Dusenberg Motor Corporation, and Locomobile Company, shall retain the right to complete such arrangements, on the basis of royalties at not less than the equivalent of two dollars each for engines produced under such licenses, and, in the event that in any such case the arrangements should not be completed, the party of the first part shall have all the rights in law and in equity against each and all of said three concerns which but for this instrument he might have had.

"In witness whereof, the parties hereto, and to another instrument of like tenor, have set their hands, and the party of the second part has caused its corporate seal to be affixed the day and year above written.

"Rollin Abell,
"General Motors Corpn.
"By W. C. Durant, Prest."

"General Motors Corporation, Detroit, Michigan.

"Office of the President, October 24, 1919.

"Mr. Rollin Abell, Milton, Norfolk Co., Mass.—Dear Sir: This will confirm my verbal statement to you that the General Motors Corporation will be glad to take a nonexclusive license for the manufacture of your valve mechanism, in accordance with our agreement dated June 24, 1919. Will you be so kind as to have your counsel submit a form of license for our consideration,

addressing the same to me at the New York office, 1764 Broadway. I have asked Mr. Taub to furnish you with a set of blueprints, as I promised you I would do.

"With kind regards, I am very truly yours,
"K. W. Zimmerschied, Assistant to the President."

The trial proceeded upon the theory that the contract of June 24 might, as matter of law, be construed to contemplate such acceptance of the option by the defendant, by a mere request in writing for the submission of a form of license, as to constitute a bilateral contract for a license; that it was competent for a jury to find, with the aid of parol evidence, that Zimmerschied's letter was a duly authorized and intended binding acceptance of this option by the defendant corporation; and that defendant's subsequent refusal to execute a license, containing the minimum provision for royalties set forth in the agreement of June 24, constituted such breach as to ground a present right of action. Thereupon special questions were put to the jury and answered as follows:

"1. Did the defendant refuse to go on with negotiations to complete the contract solely for the reason that the $50,000 minimum was insisted on by the plaintiff?

"The jury answer: Yes.

"2. Was it the intention of the parties that the letter of October 24, 1919, should be a final acceptance of the nonexclusive option in the contract of June 24, 1919?

"The jury answer: Yes.

"3. Was it the intention of the parties that, after the letter of October 24th had been sent, further negotiations were to be carried on, and that no binding contract should exist between the parties until a further formal instrument embodying the agreement had been prepared, considered, and signed by the plaintiff and the defendant?

"The jury answer: No.

"4. Did Zimmerschied have authority to bind the defendant by the letter of October 24, 1919?

"The jury answer: Yes.

"5. What are the plaintiff's damages?

"The jury answer: $154,816.66."

The court then ordered an alternative verdict for the plaintiff, as follows:

"The jury find for the plaintiff and assess damages in the sum of one hundred and fifty-four thousand eight hundred and sixteen and 66/100 ($154,-816.66) dollars.

"But if, as a matter of law, the plaintiff is not entitled to a verdict, then the jury find for the defendant and consent that this verdict may be entered on order of the United States District Court, for the District of Massachusetts, or of the United States Circuit Court of Appeals for the First Circuit, or of the Supreme Court of the United States, with same effect as if returned by them."

The defendant moved to set aside this verdict and for the entry of a verdict for the defendant. This motion was denied. The District Judge filed the following memorandum:

"I have carefully considered the questions presented by the defendant's motion to set aside the special findings and the verdict for the plaintiff and to enter the alternative verdict for the defendant.

"The plaintiff's case rests on what was a mere slip on the part of the defendant. I have no doubt that, when Zimmerschied wrote his letter to the

plaintiff on October 24, 1919, neither he nor anybody in charge of the defendant's business had in mind the provisions of the contract of June 24, 1919, whereby an acceptance of the nonexclusive license obligated the defendant to pay at least $50,000 a year for three years, nor that the defendant would not have taken the license, if its officers had realized that such a provision was in the contract. There is doubt whether the letter referred to ought as a matter of law to be construed as a definite acceptance of the option contained in the contract, and whether the statute of frauds is not a defence to the action. If the verdict for the plaintiff was warranted in law, it is not so plainly against the evidence—although I myself should have rendered a different conclusion on the second and third findings—as to justify setting it aside on that ground. The questions of law will be fully open to the defendant in the Court of Appeals. And I am not so clearly of opinion that my rulings at the trial upon them were wrong as to require the verdict to be set aside for that reason.

"Verdict to stand."

The fundamental question presented is whether the plaintiff has pleaded and shown any contract binding the defendant to execute a nonexclusive license. We think he has done neither; that the declaration was demurrable.

Our interpretation of the two documents makes it unnecessary to determine the legal validity, under the statute of frauds, of an oral extension of the time limit set in the contract of June 24.

[1] On this basis, we have a contract consisting simply of two written instruments. We can see no reason why such a case does not fall within the general rule, that the construction of written instruments is for the court and not for the jury. These writings are not within any of the exceptions to that rule. See Williston on Contracts, § 616, p. 1194, where it is said:

"If such uncertainty or ambiguity as there may be in a writing does not arise from, and cannot be solved by, any special local meaning of the words used, or any usage or surrounding circumstances. the court will deal with the matter itself, as the difficulty of construction must be solved from the writing alone. Even though a contract is oral, if the exact words used by the parties are not in dispute, the court will deal with the matter in the same way as if the contract was written."

Compare Goddard v. Foster, 17 Wall. 123, 142, 21 L. Ed. 589; Smith v. Faulkner, 12 Gray (Mass.) 251, 255, 256; Hutchison v. Bowker, 5 M. & W. 535, 540, 542; Wigmore, Evidence, § 2556; 38 Cyc. 1522; Globe Works v. Wright, 106 Mass. 207, 216.

"The construction of a doubtful instrument itself is not for the jury, although the facts by which it may be explained are." By Parke, B., in Morrell v. Frith, 3 M. & W. 402.

The court cannot devolve its duty of construing written instruments upon the jury merely because its performance involves possible difficulty. Special findings inconsistent with the legal construction of writings must be disregarded. Compare Menage v. Rosenthal, 175 Mass. 358, 56 N. E. 579, and cases cited.

The agreement of June 24 provides for experimentation with Abell's invention, at the defendant's expense, including $2,000 a month to the plaintiff himself; the period of experimentation was to end on November 1, 1919; it looks toward subsequent license relations, but leaves essential elements of such a contract undetermined.

In paragraph 1 we have the usual formal language of a contract binding both sides:

"The party of the second part grants to the party of the first part the use of its facilities for the purpose of experimentation * * * and agrees to pay all expenses of the said experimentation. * * * The party of the first part undertakes and promises to give such time to the experimentation as may be reasonably necessary."

But when we turn to paragraph 2, dealing with the contemplated license arrangements, we find quite different language. The contrast is most significant; in it defendant agrees to nothing:

"The party of the first part agrees to enter into a contract with the party of the second part at such time before October 16, 1919, as the latter shall in writing request, which contract shall provide either:

"A. For a nonexclusive license to the party of the second part * * * [with a schedule of royalties with a minimum provision of $50,000 a year for the first three years]. The provisions of such contract as to methods and time of monthly payments, and other provisions for the proper and reasonable protection of parties to be such as may be agreed upon if the party of the second part should decide to take up this option. Or

"B. For an exclusive license. * * * "

[2] The crucial point is that, while paragraph 2 requires plaintiff to enter into a contract with "the defendant at such time before October 16, 1919, as the latter shall in writing request," it does not contemplate that such written request shall bind the defendant to enter into a contract with the plaintiff. It leaves the defendant free until the requested license has been submitted by the plaintiff and duly executed by the defendant. If the intent had been to bind the defendant by preliminary agreement to take a license, so that its mere written request for the submission of a form of license would have been such acceptance of an option as to close a bargain, the language used in the vital part of paragraph 2 would have been something like this:

"If such experimentation shall prove successful, then on the written request of the party of the second part, at any time before October 16, 1919, for a license, the parties shall become mutually bound to enter into such license contract, which contract shall provide: A," etc.

But nowhere is there any sufficient statement of the terms of an agreement to which, on the plaintiff's theory, the defendant was to be bound, if and when it should make such written request.

We are therefore constrained to the conclusion that the original basic contract did not contemplate a closed bargain, binding on both parties, on the mere written request by the defendant that the plaintiff submit a license.

This result not only gives the words used their ordinary signification, but is accordant with what would naturally be expected as a reasonable business proposition, consistent with the interests of both parties, under the conditions surrounding them. The plaintiff was an inventor, and presumably, like most inventors, had a very high opinion of the value of his invention. The defendant was sufficiently impressed, so as to be willing to furnish facilities and pay the expenses, including the very substantial payment of $2,000 a month to the plaintiff himself (an aggregate expenditure of perhaps $10,000), to test the practical

value of the device. So far, it was a one-sided arrangement, almost wholly for Abell's advantage. The real—practically the only—consideration. for the defendant's agreement to invest about $10,000 in testing the plaintiff's invention was its contingent, narrowly limited, and ill-defined right to have a license, and this right was weighted with royalty terms involving large payments to the plaintiff. Failure of the defendant either to request the submission of a license, or, after request, to proceed further, would leave the plaintiff—as he has been left—the party most advantaged by the four months' experiment at the defendant's expense. The plaintiff has lost nothing; he has gained a chance to develop and demonstrate the value of his invention at the defendant's expense. The defendant has gained nothing; but it has incurred a substantial expense in what has turned out to be for it a fruitless experiment. This result is entirely consistent with what the parties must have contemplated as not unlikely to arise out of the absence in the contract of June 24 of definite provisions in the outlined license contract for reasonable protection of the parties. Clearly, if the invention had proved so useful as to warrant such large royalties as were scheduled in this outlined license, the field for infringement suits would have been open and dangerous. Questions as to whether licensor or licensee should defend the validity of the patent; as to payment or nonpayment of royalties, pending possible litigation; as to terminating or reducing the royalty payments, in case the patent should in whole or in part be held invalid—were likely to arise and to prove of much financial moment. On them the parties might not improbably have deadlocked, if a license contract had been submitted, with the same result now reached—no license. A license agreement, as the form books show, is a rather complicated contract.

If the parties had intended more, the natural way to effect their purpose would have been to work out forms of nonexclusive and exclusive licenses, annex them to the contract of June 24, with a provision that, on request in writing by the defendant before October 16, the parties should become bound to execute and deliver the form elected by the defendant.

It is plain that defendant in the June contract agreed to no commitment beyond paying the expenses of the experiment, and that Abell was content (as well he might be) with a chance to demonstrate, at the expense of the defendant, the value of his invention, with a certainty of a lucrative contract if his optimistic belief in his concept should, in the opinion of the defendant, prove justified. The provision for a minimum royalty of $50,000 a year for three years was obviously inserted to protect Abell against obligation to give a license on terms inconsistent with his view of the large value of his invention. It was a proper and effective means to that end; but it cannot be perverted into a device which leaves the plaintiff his patent, while imposing a loss of more than $150,000 upon the defendant.

Even more difficult is it to construe Zimmerschied's letter of October 24 as an intended and binding acceptance of an outstanding option for a license. We put one side any question of fact as to Zimmerscheid's authority to bind the defendant; we deal only with the purely

legal problem of the construction of his letter in connection with the contract of June 24. Plainly this letter is not to be construed as such intended acceptance of the option as, without more, to bind the writer's corporation, unless Zimmerschied knew, or was bound to know, that the June contract contemplated a closed bargain, if and when the defendant should request the submission of one of the two alternative forms of license—a construction we have already rejected.

But the letter shows on its face that the writer had no idea he was closing an important transaction; he was negotiating, or reopening negotiations, not contracting. This letter is not signed "General Motors Corporation, by K. W. Zimmerschied, Assistant to the President." It was written by the subordinate who had conducted the negotiations leading up to the formal agreement of June 24, which, after a month's delay, had been signed by the president in the name of the corporation. The June contract, which was assumed to require the signature of the president, involved, as above noted, perhaps $10,000, and not very important business relations for four months or less; the present alleged contract involves an annual minimum of $50,000 for 3 years, and contingent obligations of large moment for perhaps nearly 17 years. In this letter Zimmerschied says:

"This will confirm my verbal statement to you [not agreement with you] that the General Motors Company will be glad [future tense] to take a nonexclusive license for the manufacture of your valve mechanism in accordance with our agreement dated June 24, 1919."

This language, standing alone, falls far short of expressing a purpose of the writer to bind the defendant corporation to an important, expensive, and long-term contract. But, if otherwise there were possible doubt as to the writer's meaning, that doubt is resolved by the next sentence:

"Will you be so kind as to have your counsel submit a form of license for our consideration, addressing the same to me at the New York office?
"Very truly yours, K. W. Zimmerschied, Assistant to the President."

Clearly the plaintiff's case cannot be stronger than it would have been if, prior to October 16, Zimmerschied had written the plaintiff:

"The General Motors hereby, in accordance with our agreement of June 24, requests that you submit a form of nonexclusive license for its consideration."

Such request might imply that the corporation would "be glad" to take a nonexclusive license. But it could not be interpreted as meaning a present purpose to be bound, for a written "request" to "submit a form of nonexclusive license for consideration" is plainly not such an acceptance of an option as to bind the party so requesting.

Compare Steamship Co. v. Swift, 86 Me. 248, 29 Atl. 1063, 41 Am. St. Rep. 545, an able opinion by Mr. Justice Emery, in which he cites and reviews many cases involving similar or analogous questions, and summarizes as follows:

"It is quite clear that, after all, the question is mainly one of intention. If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the

other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words. If the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.

"In determining which view is entertained in any particular case, several circumstances may be helpful, as: Whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested, or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

The result is that the plaintiff has neither alleged nor proved any enforceable contract.

Judgment must, under the alternative verdict, be entered for the defendant, with costs in this court.

The judgment of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion, and the plaintiff in error recovers costs in this court.