## The Telluride Power Transmission Company et al. v. Crane Company.

1. CONTRACTS—*Question to be Determined from Documents Comprising.*—The fact that the document or documents is or are silent as to one or more matters concerning which there might have been expression is immaterial. In this regard the question before the court is, do the writings upon their face contain a definite contract; do they import a legal obligation without uncertainty as to the object or extent of the engagement.

2. SAME—*Signing and Delivery of Papers a Question for the Jury.*— Whether papers purporting to contain a contract were signed by the parties and, if signed, were delivered, are questions of fact for the jury.

3. SAME—*Made Out Partly by Letters and Partly by Evidence of Conversations.*—If a contract has to be made out partly by letters and partly by evidence of conversations concerning which there is not entire agreement as to what was said or the circumstances under which the utterances were made, the question of whether there was a contract, as well as what it was, is a question of fact for a jury.

4. SAME—*Commercial Correspondence.*—The rule that whether written instruments do or do not constitute a contract is a question of law for the court, applies to commercial correspondence as well as to formal written documents.

5. SAME—*When Presumption is that the Entire Engagement of the Parties is Contained in the Writing.*—When the writing itself upon its face imports a complete legal objection, without uncertainty as to the extent or object of the contract, it is conclusively presumed that the entire engagement of the parties is contained in the writing.

6. SAME—*When Express or Implied Warranty Can Not be Imported into Contract.*—The parties having executed writings expressing upon their face a complete contract, certain as to its object and extent, neither an express nor an implied warranty can be imported into it by proof of prior oral conversation.

7. SAME—*Implied Warranty of Fitness for Purpose for Which Object is Ordinarily Used.*—If an article is to be made or supplied to the order of a purchaser, there is an implied warranty that it is reasonably fit for the purpose for which it is ordinarily used, or fit for the special purpose designed by the buyer, if that be known to the vendor when the order is given.

8. SAME—*Warranties in Bargain and Sale of Existing Chattels.*— In the bargain and sale of an existing chattel by which the property passes, there is not (in the absence of fraud) an implied warranty of the good quality or condition of the thing sold, while there is an implied guaranty that the articles sold by a particular description are of that description.

9. SAME—*When Inducement to Written Contract May be Shown.*— An inducement to a written contract, such as a representation of some particular quality or incident to the thing sold, may in some cases be received in evidence, but a buyer can not show such representation unless he can show that the seller by some fraud prevented him from discovering a fault which he, the vendor, knew to exist.

Assumpsit.—Appeal from the Circuit Court of Cook County; the Hon. HENRY B. WILLIS, Judge presiding. Heard in the Branch Appellate Court at the October term, 1901. Affirmed. Opinion filed October 24, 1902.

August 31, 1896, the Telluride Power Transmission Company made a contract with one T. B. Rhodes for the erection of a pipe line and flume. Rhodes applied to the Crane

Company for pipe therefor, and after various negotiations gave to it the following order:

"SALT LAKE CITY, September 14, 1896.
CRANE COMPANY, CHICAGO.

GENTLEMEN: Please ship to Ophir, Colo., the following:
1,300 ft. 16 5 gauge flanged pipe asphalted.
516 " 16" $\frac{1}{4}$ gauge flanged pipe "
with necessary bolt gaskets. To be in transit not later than Oct. 31, 1896.

Terms cash on delivery of pipe.
Yours truly,
T. B. RHODES & Co.

Flange on one length sixteen to fit flange on fifteen."

The Crane Company at once accepted this order.

September 29, 1896, Rhodes wrote to the Crane Company, as follows:

"TELLURIDE, COLO., Sept. 29, 1896.
CRANE & CO., CHICAGO, ILLS.

DEAR SIRS: Herewith I hand you list of angles req'd. They should be made as arcs or circles whose radius is 5 times diam. of pipe, and should have flanges for connection with pipe. The shell should be thick enough to give factor of safety of 5 on an assured tensile strength of the steel of 60,000 lbs. per sq. in.

Please make them at once and ship with pipe. I regret exceedingly that we could not get the profile of the pipe line sooner. I will to-morrow order some valves, and will advise you whether any change in length of pipe already ordered will have to be made. Could not get angles and actual surveyed length of line until to-day.

Yours truly,
T. B. RHODES & Co."

With this letter was a table of vertical angles, diameter of pipe and "head in feet," the latter ranging from 983 to 507 feet. December 6, 1896, the Crane Company wrote to Rhodes:

"We have wired you that bends were made of $\frac{7}{16}$" metal of 60,000 lbs. tensile strength, factor of safety of six, and also advising we would furnish new gaskets for $50 net."

Rhodes, on January 14, 1897, wrote to the Crane Company:

"We understand that Mr. Nunn will be in Chicago soon,

if he is not already there, on his way west. * * * We wired you that his engineer was familiar with the pipe, and was in position to pass upon it before any settlement is made, as well as afterward; his brother is the engineer to whom he referred, and he has been trying to have the thickness of the pipe measured. Of course, with the flanges in the pipe, it is impossible to do it correctly. * * * We guaranteed the pipe to stand the required pressure with a factor safety of five. * * * We had the bursting strength figured by a very competent engineer, and told him to allow a factor safety of five, which he undoubtedly did. We did not guarantee the pipe to be of any special thickness; our only guarantee is that it has a factor of safety of five. And that is all that need be said to Nunn by you. * * * We would like for you to make the best possible arrangement with Mr. Nunn, and whatever loss you are at we will make good."

About December 7, 1896, Mr. Nunn applied to the Crane Company to have the pipe then on the cars at Ophir, Colorado, delivered to the Telluride Company; and December 18th wrote to the Crane Company the following letter:

"DEC. 18, 1896.

CRANE Co., 10 NORTH JEFFERSON ST., CHICAGO, ILL.

GENTLEMEN : I am advised from Telluride, Colorado, that Mr. T. B. Rhodes is unable to take up your draft against bill of lading for about $2,000 on account of material ordered by him to complete a contract with the Telluride Power Transmission Company. We have advanced Mr. Rhodes a good deal beyond the payments provided for by our contract with him and it is not entirely convenient for me to pay your draft while absent from Telluride. I shall return next month. If you will order the material delivered to us by the railway company and it passes the inspection of our engineer, we will receive it at once and pay your draft on February 1st and also greatly appreciate your courtesy in the matter. On account of the well known strength of our company I have no hesitation in asking the credit. Mr. James Campbell of St. Louis is the president, and Mr. H. R. Newcomb, treasurer of the Savings and Trust Company of Cleveland, Ohio, is the treasurer of our company.

Please telegraph me care Holland House, New York, your decision.

Very truly,

LUCIEN L. NUNN."

To this the Crane Company, December 22d, replied by letter containing, among other things, the following :

" Your proposition is to pay us on February 1st, provided the material, when delivered, passes the inspection of your engineer. We can not consent to any condition of this character, because it is too general in its terms. We do not know what your arrangement was with Mr. Rhodes, nor what kind of inspection would be required. We simply know the material we have furnished is strictly in accordance with Mr. Rhodes' order to us, and we should not be willing to deliver it except on absolute payment, or promise of payment. You will no doubt appreciate the correctness of our position on this point.

Yours truly,<br>
CRANE COMPANY.<br>
O. P. DICKINSON."

December 30, 1896, the Crane Company telegraphed to Mr. Nunn asking for a reply to its letter of the 22d. Mr. Nunn replied as follows :

" HOLLAND HOUSE, NEW YORK, Dec. 30, 1896.
CRANE COMPANY, 10 NORTH JEFFERSON ST., CHICAGO, ILL.

GENTLEMEN : I greatly regret the delay in adjusting the matter of the pipe shipped to Mr. T. B. Rhodes, at Telluride, Colorado. I have but just returned from my Christmas vacation.

My letter to you must have been very ambiguous for you have entirely misunderstood my proposition. It was not to receive the pipe, and then pay for it, if satisfactory, but to ascertain by inspection whether it was such as we required, and if it was, to receive it immediately and pay for it on the 1st of February next. I am confident Mr. Rhodes is financially unable to comply with his contract, with either you or us. Of course, as we did not order the pipe, you do not expect us to take it and pay for it unless it is such as we can use; but if it is such as we require we are anxious to have it immediately, and of course, will pay your price. I do not like to give a promissory note. Our company has never executed a note in its entire history. A note would add nothing to your security; if we take the material we are bound to pay for it.

Please do me the courtesy of delivering this shipment to us without further delay, and I will telegraph my engineer to inspect it at once, and receive it on the cars, if he thinks the strength sufficient. Being away from home, I should

like very much to have this favor. Kindly wire me on receipt of this.

Very truly yours,

L. L. NUNN."

January 23, 1897, the Crane Company telegraphed the Telluride Company:

"Railroad wires cars pipe still uncalled for and must be disposed of without delay. Nunn when here agreed to accept pipe, and we supposed it taken before this. Why delay? Answer."

To this the Telluride Company replied, January 23, 1897:

"Delayed account complications with contractors, but practically settled."

February 5, 1897, Mr. Nunn wrote the Crane Company in part as follows:

"DENVER, COLORADO, February 5, 1897.
CRANE COMPANY, 10 NORTH JEFFERSON ST., CHICAGO, ILLINOIS.

GENTLEMEN: I was delayed in my return west by the very serious illness of my brother, and but just arrived here this morning. My engineer from Telluride met me, and explained the situation respecting the shipment of pipe to Mr. Rhodes, at Ophir. The whole matter is certainly very badly mixed; Mr. Rhodes can not be found; he has abandoned the matter, and the demurrage on the four cars since November 16th, 17th and 18th amounts to something over $400. My firm has represented the railroad, as attorneys, ever since its construction. I called to-day and used all the influence I could to have the demurrage charge deducted, and succeeded to the extent of having it reduced to $100.

We regret very much that you have suffered any inconvenience, and we are anxious to render you any assistance in our power, but of course we are not responsible for Mr. Rhodes' contracts, and it would seem from the condition he is in that he is entirely unable to make any use whatever of the pipe, and that you would therefore have it on your hands, with freight charges one way, amounting to more than half the price of the pipe.

If you will instruct us by wire Monday morning, to do so, we will settle with the railroad and stop further expense, and will take the pipe at the original bill, paying one-half within a few days, and the other half about June 1st, charging you the amount paid for demurrage."

To this the Crane Company immediately replied by wire :

" L. L. NUNN, AGT. T. P. & T. Co., TELLURIDE, COLO.:

We accept proposition contained in your letter fifth.
CRANE Co."

And wrote :

" CHICAGO, February 8, 1897.

L. L. NUNN, MANAGER, TELLURIDE POWER & TRANSMISSION Co., TELLURIDE, COLO.

DEAR SIR : We received, this morning, your favor of the 5th, and as requested, immediately wired you in reply, 'We accept proposition contained in your letter 5th.'

This proposition is, that you will take the pipe which we sold to T. B. Rhodes & Co., paying the freight and demurrage charges, and that you will then pay us the amount of our original bill less $100 demurrage, making payments one-half within a few days and the other half about June 1st.

The amount of the original bill referred to was $2,048.77. From this is to be deducted a freight allowance of $72.68, leaving the net amount $1,976.09, as stated in our letter of Dec. 22nd, addressed to you at New York.

We had rather expected to receive payment of the full amount now, but are willing to make the concession of time in view of all the circumstances and especially because you promise to give us orders for additional pipe. We shall be glad to receive such orders and think that by dealing directly with you we shall avoid any misunderstandings.
Yours truly,

CRANE COMPANY.

O. P. DICKINSON."

Appellants then received and used the pipe.

Upon the trial it was stipulated :

" A question has arisen as to whether plaintiff or the defendants are entitled to open and close the argument in the above entitled cause, and for the purpose of disposing of the question it is agreed between the parties hereto that wherefore the defendants purchased from the plaintiff a lot of pipe then on the cars at the town of Ophir, Colorado, at the agreed price of $1,876.09; that $1,000 was paid on account of said purchase on June 29, 1897, and that no other payments have been made; and it is further agreed that defendants received said pipe; and that this agreement shall be read in evidence when the jury is sworn to try the

issues in this case, or to the court, if the jury should be waived, and that thereupon the defendants shall be permitted to offer their evidence, and that counsel for defendants shall have the opening and closing arguments."

Appellee brought suit to recover the unpaid $876.09. Appellants pleaded separate pleas of the general issue and set-off, alleging that the defendants were engaged in the business of generating electricity by water power; that the plaintiff sold the defendants pipe to carry water for that purpose, which the plaintiff agreed was of a certain strength, quality and thickness; of the best material in the market suitable for the purpose for which it was to be employed; of sufficient quality and strength to carry water, as aforesaid, and to withstand the pressure consequent upon the transmission of said water; that the pipe was not made in accordance with the specifications and requirements in the order for the same, neither was it of the strength, quality and thickness agreed by the plaintiff, nor of sufficient strength, quality and thickness to transmit such water, but by reason of the many imperfections and of its failure to come up to the quality, strength and thickness agreed to be furnished, and by reason of its poor quality and the poor character of the labor and workmanship employed in the manufacture of the same, burst, repeatedly, so that the defendants could not use the same for the carrying of said water, whereby the defendants were damaged to the extent of $50,000.

The defendants offered evidence tending to show that Rhodes, before giving his order, showed Mr. Lee, the agent of the Crane Company, his contract with the Telluride Company and the profile, showing the requirements and water pressure of the contemplated line; that Mr. Lee understood that the pipe was to have a safety factor of five and a tensile strength of 60,000 pounds to the square inch, and said that that material would be furnished; Rhodes, upon cross-examination, testified that he did not understand the Crane Company to be manufacturers; that he understood they bought on the market and were just jobbers.

Defendants also offered evidence tending to show that when, after the failure of Rhodes to complete his contract, Mr. Nunn called upon the Crane Company with reference to the undelivered pipe then on the cars at Ophir, and, mentioning the factor of safety required and amount of head of water the pipe would have to stand, was assured by Mr. Willard of the company that the quality of the pipe was the very best; that the pipe was installed and broke under the water pressure, causing great damage; that the pipe was apparently burned in welding and had not a .tensile strength of 60,000 pounds to the square inch, nor a safety factor of five.   This evidence the court excluded, holding that the contract was in writing and embraced in the letters and telegrams hereinbefore set forth.   The jury were instructed to return a verdict for $876.09.

Kraus, Alschuler & Holden, attorneys for appellants.

James H. Barnard, attorney for appellee; E. M. Ashcraft and E. M. Ashcraft, Jr., of counsel.

Mr. Justice Waterman delivered the opinion of the court.

Appellants contend that the contract was partly oral and partly in writing and that whether it was a parol or written contract is a question of fact to be determined by a jury.

That the construction—meaning of the words employed to express a contract—is to be determined by the court, is undisputed.   Where the execution, signing and delivery of written instruments is unquestioned, in the absence of accident, fraud or mistake, whether the written papers, one or more, constitute a contract, as also whether therein is expressed the entire agreement of the parties, is to be decided by the court.

The fact that the document or documents is or are silent as to one or more matters concerning which there might have been expression, is immaterial.   In this regard the question before the court is, do the writings upon their face contain a definite contract—import a legal obligation—without uncertainty as to the object or extent of the engage-

ment.  Seitz v. Brewers Refrigerating Co., 141 U. S. 510–516; Scanlan v. Hodges, 52 Fed. Rep. 354; Dunn v. Rothermel, 102 Pa. St. 272–282; Roe v. Taylor, 45 Ill. 485–491; Goddard v. Foster, 17 Wall. 123–142; Thompson on Trials, Sec. 1067.

Whether papers purporting to contain a contract were signed by the parties, and, if signed, were delivered, are questions of fact for the jury.  Thomas v. Barnes, 156 Mass. 581, 584.

If a contract has to be made out partly by letters and partly by evidence of conversations concerning which there is not entire agreement as to what was said or the circumstances under which the utterances were made, the question of whether there was a contract, as well as, if so. what it was, is a question of fact for a jury.  Thompson on Trials, Sec. 1083; 1 Taylor on Evidence. Sec. 36; 1 Story on Contracts, Sec. 18.

The rule that whether written instruments do or do not constitute a contract is a question of law for the court, applies to commercial correspondence as well as to formal written documents.  Scanlan v. Hodges, 52 Fed. 354–355.

When the writing itself upon its face imports a complete legal obligation, without uncertainty as to the extent or object of the contract, it is conclusively presumed that the entire engagement of the parties is contained in the writing.  Greenleaf on Evidence, Sec. 275; Seitz v. Brewers' Refrigerating Co., 141 U. S. 510–517; Benjamin on Sales, Sec. 202.

The parties having executed writings expressing upon their face a complete contract, certain as to its object and extent, neither an express nor an implied warranty can be imported into it by proof of prior oral conversation.

This suit is not brought upon the contract made by the Crane Company with Mr. Rhodes.  The pipe purchased by him having been shipped to Ophir and being there upon the cars ready for delivery upon payment of the purchase price, appellants asked to have that pipe, then on the cars at Ophir, delivered to them.

Concerning an agreement for such delivery to appellants various letters and telegrams were exchanged, with the

result that by the letter from Nunn to appellee, dated February 5th, and replies thereto by telegraph and mail, each dated February 8th, a contract was made for the sale and delivery at Ophir of certain property, then existing, for a certain price.

There was no contract with appellants to procure, select or manufacture; nor is there any evidence that the Crane Company were the manufacturers of the pipe in question; on the contrary Mr. Rhodes, appellants' witness, testified that in making his contract with the Crane Company for the pipe, he did not understand the Crane Company "to be manufacturers;" that he understood they bought on the market and were just jobbers.

If an article is to be made or supplied to the order of a purchaser, there is an implied warranty that it is reasonably fit for the purpose for which it is ordinarily used, or fit for the special purpose designed by the buyer, if that be known to the vendor when the order is given. Benjamin on Sales, 645.

In the bargain and sale of an existing chattel by which the property passes, there is not (in the absence of fraud) an implied warranty of the good quality or condition of the thing sold; while there is an implied guaranty that the articles sold by a particular description are of that description. Benjamin on Sales, Secs. 647–600; Barr v. Gibson, 3 M. & W. 390; Taylor v. Bullen, 5 Ex. 779.

An inducement to a written contract, such as a representation of some particular quality or incident to the thing sold, may, in some cases, be received in evidence; but a buyer can not show such representation unless he can show that the seller by some fraud prevented him from discovering a fault which he, the vendor, knew to exist. Benjamin on Sales, Sec. 621; Wright v. Crookes, 1 Scott, N. S. 685–678; Taylor v. Bullen, 5 Exchq. 779–783.

There is no evidence that the Crane Company had either notice or knowledge of any defect in the pipe sold to appellants, or that by any fraud they prevented a discovery of faults.

We do not regard the case of Ruff et al. v. Jarrett, 94 Ill. 475; as "on all fours" with the present or as allowing evidence of conversations to be introduced to add to or qualify the terms of a written contract. In that case the court said that the written instrument there considered could not be regarded as a contract without the aid of extrinsic evidence.

We do not think that appellants had an opportunity for inspection. They did have the right to refuse to buy without previous inspection.

It is manifest from the correspondence that the Crane Company would not deliver the property without payment or a definite promise to pay; in other words, unless before delivery the property was purchased by appellants. And it is further manifest that appellants purchased the property upon the terms of the definite proposition contained in their letter dated February 5th, accepted by appellee by telegram dated February 8th, and by letter of the same date in which the written proposition of appellants was repeated. These three writings contain the entire contract; before them there was no meeting of minds; they have all the force of a formally executed written document.

The order of Mr. Rhodes to the Crane Company, made September 14th, was in writing; it contained nothing as to quality of pipe but was definite as to size, quantity and some other matters.

So soon as it was accepted there arose a contract for such pipe, sold at the market price for cash on delivery. It was, as Rhodes understood, made by him with a jobber. That such pipe was by the appellee sent to Ophir, it did say in its letter of December 22d, and it may well be said that such representation was an inducement to the contract made by the letters of February 5th and 8th, but there was no evidence that appellee knew that it was false, nor that the pipe was not such as Rhodes ordered.

Rhodes did, September 29th, write to the Crane Company that "the shell," whether of pipe or connections is uncertain, should be thick enough to give a factor of five on an

assured tensile strength of the steel of 60,000 pounds per square inch; that appellee undertook to make "the shell" of the pipe of such thickness or strength is not shown; the order of September 14th was accepted long before September 29th. September 30th Rhodes wrote to appellee, "Ship the pipe as ordered except," etc. The order for the pipe was given to appellee September 14th.

The stipulation upon the trial was made merely for the purpose of giving the defendants a right to open and close, and we do not think should be construed as affecting the right of appellants or either of them to any set-off they might otherwise interpose.

If the correspondence that passed between appellants and appellee February 5th and 8th does not upon the face thereof contain a written repository of a definite agreement, certain as to object and extent, so that the court, standing in the shoes of the parties, can see that in these writings there is contained such agreement, then the writings are not conclusive as to what the contract was; if there is, as we find in these writings, such plain agreement, then by the well established rule of law all previous negotiations were merged therein.

The judgment of the Circuit Court is affirmed.