CRIMP v. McCORMICK CONST. CO. et al.

(Circuit Court of Appeals, Seventh Circuit.    March 5, 1896.)

No. 251.

1. CONTRACTS—INTERPRETATION.
    The reasonable intention of the parties to a contract is to be sought in the words of such contract, not assumed; and it is not the duty of a court to bend the meaning of some of the words of a contract into harmony with a supposed reasonable intention of the parties.

2. SAME—18 C. C. A. 70, 71 FED. 356, REAFFIRMED.
    The terms of the contract involved in Crimp v. Construction Co., 18 C. C. A. 70, 71 Fed. 356, reconsidered, and the decision therein affirmed.

This was a suit by Eugenia Crimp, as executrix of the will of W. G. Crimp, against the McCormick Construction Company and others, to determine the rights of the parties in the assets of the corporation. The decree made by the circuit court was affirmed on appeal. 18 C. C. A. 70, 71 Fed. 356. Complainant petitioned for a rehearing.

John N. Jewett and R. W. Baylies, for appellant Eugenia Crimp.

Wm. J. English, for appellant Ingersoll-Sergeant Drill Co.

W. E. Church, Tenney, McConnell & Coffeen, Collins, Goodrich, Darrow & Vincent, A. Burton Stratton, and McGlasson & Beitler, for appellees.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

WOODS, Circuit Judge. This petition in large part covers ground already considered, and to that extent requires no response. In so far as it goes beyond the original briefs and the argument at the hearing, it is characterized by inaccuracy of statement, and by an uncalled-for exhibition of temper. After quoting from our opinion the proposition that Crimp's purchase of stock was conditional, or upon an agreement to resell at the same price, the petition says:

"Now, let us see in what sort of a hole this conclusion puts the court. We take the court at its word. It is no use to say that there is not a sentence, a line, a word, or a syllable of this contract that points to a conditional sale of the stock, or of a sale with an agreement to repurchase at the same price

or any other price. No matter for this. The court wipes out the old con-
tract and constructs a new one. The proposition is that McCormick sold his
stock (126 shares) to Crimp for $25,200, paid to the construction company
upon the condition that Crimp should sell it back to McCormick at the same
price, McCormick (not the construction company, that received the money)
agreeing to repurchase at that price, provided the other parts of the agree-
ment were duly performed; that is, McCormick agreed to repurchase, if he
and the construction company, who were together the first party to the con-
tract, did as they agreed to do, and if they did not perform the contract on
their part, and, by their failure to perform, destroyed the value of the stock,
then McCormick would not be bound to repurchase. McCormick and the
construction company did in everything fail to perform, and utterly aban-
doned the execution of the drainage contract, and therefore no obligation to
repurchase the worthless stock or to refund the money to Mr. Crimp rests
upon anybody. * * * There are some things which the members of the pro-
fession can bear patiently, treat respectfully, and discuss with good temper,
even though they may consider them errors. Other things in the same line
seem so unnatural, so lacking in perceptions of justice and reason, that they
stir up all the bitterness of feeling which can find lodgment in the human
breast. Prudence would then dictate a suspension of comment. We yield
to the dictates of prudence. If the court adheres to the conclusion announced
in the last quotation from the opinion, this petition must be denied. If it does
not so adhere (and we fail to see how it can), the petition must be granted,
for the conclusion is the result of wrong methods and wrong reasoning, and
the whole case must be reconsidered by different methods and upon differ-
ent theories."

This is Nestor playing the part of Thersites, though hampered
somewhat, it seems, by a prudent regard for the scepter of Ulysses.

But from the manner we turn to the matter of the petition. "A
sale with an agreement to repurchase is usually termed a con-
ditional sale." 1 Hil. Mortg. 96. And that this agreement was of
that character is demonstrated by the first, fourth, eleventh, and
twelfth articles of the contract. The proviso that is supposed to
have made the proposition worthy only of ridicule, if it relates at
all to the undertaking of McCormick to repurchase, applies es-
pecially to the agreement of Crimp to resell. Only upon the con-
dition of that proviso did he agree to reassign the stock pur-
chased, together with that pledged, and it is not difficult to per-
ceive his motive for having the contract so framed. His belief,
manifestly, was that the company would realize large profits, and,
if he had lived to give the business his personal attention, it is
possible that his expectation would not have been disappointed;
and in that event it was his purpose, upon failure of the other
parties to fulfill to the letter their promises and covenants, to have
it in his power, if he should deem it to be to his interest, to refuse
to reassign, and, by forfeiting the 99 shares which had been pledged,
to become the owner of the entire capital stock, and thereby the
effectual owner of the entire property of the company. On the
other hand, he could hardly have failed to understand, that, if
McCormick and the construction company, by their failure to per-
form the contract, should destroy the value of the stock, or that,
if for any reason the contemplated enterprise should prove dis-
trous, the company and McCormick would thereby be made in-
solvent, and their promise, or the promise of either of them, to
repurchase or to redeem the stock, would be worthless. The sup-

posed incongruity between the agreement for a resale and repurchase and the condition upon which its performance was made dependent is therefore more imaginary than real.

The court's view of the twelfth article of the contract is criticised. "In this part of the opinion," it is said, "the court forgets that it was one of the early stipulations of the contract that the profits to be made by the performance of the drainage contract should be divided equally between the parties. * * * If not otherwise provided (and there is no other provision in the contract), the cost of all improvements and additions to the plant or ssets of the company must necessarily be taken from that fund which would otherwise go to increase the profits of the enterprise. All such improvements and additions would therefore be invested profits, and, as Crimp's interest in and connection with the construction company was to cease with the completion of the drainage contract, his share in the profits thus invested would be lost to him, unless an interest in those improvements and additions was preserved to him." This only emphasizes the significance given by the court to the twelfth article, which, unlike the fourth, is not limited to improvements and additions to the assets of the company derived from the proceeds of the drainage contract, but embraces all increment, betterment, and additions, from whatever source, accruing or made after the date of the contract. The business of the company was not limited to the performance of the drainage contract, and, if other profitable business had been done, there is no possible construction of the contract in suit by which Crimp could reasonably have been denied the joint interest so unequivocally stipulated for in the last article of it.

The case was understood to be submitted to us as one which depended in the main on the construction of the contract, unaided by extrinsic evidence, and so we decided it, overlooking nothing, though not specifically mentioning everything, within the four corners of the writing; but now it is suggested that "both competent and necessary to be considered along with the papers signed by the parties are the facts and circumstances attending their execution, and the situation of the parties themselves." If, however, the case is of a character to require or permit of such presentation, and if there is evidence in the record competent to be considered, outside of the contract, that evidence was not referred to at the hearing and has not now been called to our attention. But it is said, also, that "the opinion does not utilize the definite facts appearing upon the face of the contract for the purpose of arriving at the probable and reasonable intention of the parties. We wish again, as briefly as possible, to call attention to those facts." And here follow eight propositions, some of which accord with express terms of the contract, some are mere inferences, more or less probable, some are wholly unwarranted, and intermingled with them are subordinate suggestions and assumptions of which the contract contains no hint. For instances of the definite facts, it is stated that the construction company

was seriously embarrassed for the want of ready money; that in this situation McCormick applied to Crimp, a stranger, so far as the record shows, for assistance to enable the company to go on with the drainage contract, "and nothing more"; that the contract relates solely to the work to be done under the drainage contract; that the mere fact of Crimp's $25,200 having been advanced to the construction company imported an obligation on the part of the company to refund it; that the stock belonged to McCormick, and, however intimate his relations with the company, the two are distinct, "and cannot be, and must not be, confounded"; that the drainage contract was the property of the construction company and not of McCormick; and that, by the fourth and eleventh articles, the $25,200 advanced are to be "repaid" or "returned." The contract, however, does not show that the company was not able readily to obtain from other sources needed money, nor that McCormick applied to Crimp, nor, even by suggestion, that they were strangers, but, to the contrary, expressly recites that Crimp was "desirous of becoming interested in the construction company" upon the terms and conditions mentioned. That the contract does not relate solely to the work to be done under the drainage contract is shown by the last article, as already explained, and though it is provided, in terms, in the eleventh article, that, upon the performance of the things there mentioned, "this contract shall be ended," it is evident that, for the purposes of the twelfth article, it would continue in force. And, if presumptions are to be indulged, it is probable that the money paid by McCormick for stock went to the company because McCormick had not paid therefor, or was otherwise indebted to the company, and that thereby the shares became, as recited in the contract, "full-paid and nonassessable," and the requirement of the seventh article, that the money be applied in the particular way specified, was made reasonable, when it otherwise would not have been. It is not true, in law, that the mere fact of Crimp's money having been advanced to the construction company, under the circumstances, imported an obligation on the part of the company to refund it. But, as bearing upon the question of construction, the more important fact, evident upon the face of the contract, as it seems to us, is that all the parties, and certainly Crimp, entered into the agreement anticipating large profits from the performance of the contract with the drainage district; and, if that had been the outcome, it may be assumed that Crimp would have insisted upon the construction which the court placed upon the contract, because it would have been more beneficial to him than any other. On the theory of a loan, he could have claimed rightfully only the return of his money with lawful interest, and perhaps reasonable compensation for his services. All besides would have been usurious. If the transaction was in fact a loan, the contract was, on Crimp's part, most unconscionably exacting; and there is no rule of construction or interpretation which requires the court, in order to fasten such a character upon a writing, to

ignore any of its provisions, or to force upon them strained and unnatural definitions. As a shareholder in a speculative enterprise, it was legitimate that Mr. Crimp should make large profits, and take security for their realization. As a lender of money he was entitled only to lawful interest, for the payment of which and the repayment of the principal sum he was entitled to exact such security as he was willing to accept, but, as a good citizen, nothing more.

It is insisted in behalf of the appellant that, somehow or other, a construction shall be invented or forced which will relieve from the disaster of a condition of affairs which was not apprehended, and against which no stipulation or security was provided, or, indeed, could well have been provided, in so far as it was the result of the alleged fraudulent conduct of McCormick, made possible, and perhaps suggested, by Crimp's physical inability to interfere. It is said, further, that the contract "needs and must have construction, and not simply interpretation, in order that it may, if possible, be brought into line with the reasonable and probable intention of the parties to it. If this cannot be done, then it would be the duty of the court to pronounce the contract void for uncertainty, or fraudulent for its gross injustice, and to determine the rights of the parties, independently of the jargon of words to which their signatures were appended." And yet it is by virtue, and upon the assumed validity, of the contract, that the appellant sought relief and has whatever standing she has in court. Without it she has no pretense of a lien upon the drainage contract, or the fund realized from its sale, and she has asserted no right not dependent upon it. Besides, there is no issue in the case, nor proof, upon which the court could have considered whether the contract was for any reason invalid or fraudulent; and, if it be true, as asserted, that McCormick misappropriated or converted to his own use the money advanced by Crimp, and even if that was his intention from the beginning, it does not affect the question of the right interpretation or construction of the contract.

Finally, it is said:

"The trouble with the opinion of the court is that it is all the time sticking to the literal and technical meaning of the words employed in some of the articles of the contract. It does not try to bend that [meaning] into harmony with a reasonable intention of the parties. The effort is all the time to interpret and not to construe, to find inconsistencies and not to harmonize them, and in doing this it gives the widest and most sweeping effect to words and clauses which seem to open wide the door for successful rascality, and visits the consequences of the iniquities of the construction company and McCormick upon the victim of those iniquities in every possible way. The 126 shares of stock would be as much involved and as completely liberated from the claims of Crimp and his representative, by the forfeiture of the 99 shares under article 10, as would the drainage contract. The theory of the opinion makes Crimp agree that if the construction company and McCormick fail to perform their part of the contract, and thereby ruin the entire enterprise, he will accept 99 shares of the stock, made worthless by their defaults, in full satisfaction of his money advances and expected profits. As already said, nothing short of inexorable necessity should compel such a conclusion, and the hesitancy and want of positiveness of the opinion, if nothing else, indicate that

no such necessity exists. As the 99 shares were transferred as a security for profits mainly, it would be easy, other parts of the contract considered, to limit the effect of their forfeiture to the loss of the profits, and no rule of construction would be violated by so doing. If the court will force upon the appellant the ownership of these 99 shares by virtue of the provisions of article 10, and against her will, for the villainous conduct of McCormick and his company (which ought not to be done), we insist that the consequences should extend no further than the most rigid and limited construction of their rights absolutely requires."

To all this the opinion itself, and what we have already said here, would be sufficient answer. The theory of the opinion, neither by construction nor interpretation, can be made to bear the implication suggested. On the contrary, the opinion says that, "if that remedy"—that is, the forfeiture of the 99 shares—"were asserted, the absolute ownership of the 225 shares of stock would become vested in the appellant as the representative of the second party." Upon the construction given by the court to the contract, that is clearly so, because, on that theory, Crimp was already the owner of the 126 shares, and by reason of the default of the other parties was released from the obligation to resell. And while "the right of the company to retake possession of the drainage contract, which could not be included in the forfeiture, would immediately revive," the beneficial ownership of that contract would follow the ownership of the stock, subject, of course, as on that theory it ought to be, to the payment of the debts of the company. The suggestion, in the first lines of this last quotation, that the court ought "to bend" the meaning of the words employed in some of the articles of the contract "into harmony with a reasonable intention of the parties" is a begging of the question. The "reasonable intention" is to be sought, not assumed; and the intention contended for cannot be found in "the literal and technical meaning of the words employed" in any of the articles of the contract. It might, perhaps, by construction, be deduced from some of the articles, but not from the entire contract, without ignoring or forcing from their true significance the plain and unequivocal words and expressions of other articles. The court's construction puts upon no word, phrase, sentence, or article a strained or unfamiliar sense. Upon that construction, every provision of the contract was upon its face favorable to the appellant's testator, and if, in the outcome, there has been misfortune or injustice, it is attributable to causes outside of the contract, against which no safeguard was devised, or, perhaps, thought to be necessary.

The petition is overruled.