**BROWN et al. v. J. C. SHAFFER GRAIN CO.**

**CALEDONIA MILLS CO., Inc., v. SAME.**

(Circuit Court of Appeals, First Circuit. November 4, 1926.)

Nos. 2000, 2001.

**1. Contracts ⬅176(1).**

Construction of contracts, letters and telegrams is for court.

**2. Sales ⬅181(11).**

Evidence showing seller's delay of shipments was due to buyers' request for substituted form of payment on contracts *held* to show no abandonment or breach by seller.

**3. Sales ⬅172.**

Buyer, after asking for substituted form of payment or relief from burden of contract, cannot be heard to say that delay of seller in con-

---

sidering proposition operates as breach or abandonment.

In Error to the District Court of the United States for the District Court of Massachusetts; Clarence Hale, Judge.

Separate actions by J. C. Shaffer Grain Company against Rufus L. Brown and others and against the Caledonia Mills Company. Judgments for plaintiff, and defendants bring error. Affirmed in each case.

Horace Guild, of Boston, Mass. (P. J. Ashe, of North Adams, Mass., on the brief), for plaintiffs in error.

Joseph N. Welch, of Boston, Mass. (Richard W. Hale, David Burstein, and Hale & Dorr, all of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. [1] In these two actions for breach of contract, tried together, the court below ordered verdicts for the plaintiff. The sole question is as to the correctness of that ruling. Most of the material evidence consists of writings—contracts, letters, and telegrams. Their construction is, of course, for the court, and not for the jury. Goddard v. Foster, 17 Wall, 123, 142, 21 L. Ed. 589; Kutztown Foundry & M. Co. v. Sloss-Sheffield, S. & I. Co. (C. C. A.) 279 F. 627; Petoskey Cement Co. v. Benjamin (C. C. A.) 296 F. 9; Kalamazoo Ice Co. v. Gerber (C. C. A.) 4 F.(2d) 235, 240.

In both suits, the original plaintiff was the seller and the original defendants the buyers, under two contracts dated November 29, 1920. One was for 18 cars of yellow corn and as follows:

"Destination—Later.

"Line—Any.

"Time of shipment—Three cars each month, May to October, inclusive.

"Terms—Sight draft with bill of lading attached.

"Draft on Berkshire Coal & Grain Co., North Adams, Mass,

"Price—104½ per bus.

"Remarks: If embargoes, strikes, seller's inability to secure cars, or other delays beyond seller's control, prevent shipment within time specified, this contract remains in force until shipment can be made. Buyer agrees to pay any advance in freight between date of contract and date of shipment. Railroad regulations require that all cars be loaded to capacity; therefore buyer must accept contents of each car as loaded and settle any

surplus or deficit, at seller's asking price date car is loaded.

"Billed to shipper's order—Notify consignee.

"Shipments from Chicago subject to Chicago terms.

"Guaranteed to arrive cool and merchantable."

The other contract was for nine cars of oats:

"Time of shipment—Three cars each month, March, April, May, inclusive."

Otherwise, the terms now material are identical with the corn contract.

The only defense pleaded and now relied upon was that the seller broke or abandoned these contracts by failing to ask seasonably for shipping instructions. The question is whether there was any evidence which would have warranted the jury in finding the seller in such default. The real cause of the trouble was the severe drop in grain prices in 1920 and 1921.

[2] We turn now to the evidence of controlling importance—the letters and telegrams between the parties. As early as February 23, 1921, the seller wrote for shipping directions for the March oats; after repeated letters and telegrams, the buyers failed to furnish shipping directions admittedly then due; thereupon the seller shipped the three cars of March oats to the buyers' post office address; these oats were duly received and paid for. The suits, therefore, relate to the 18 cars of corn and the balance (6 cars) of oats.

On March 22, 1921, the buyers wrote the seller a long letter. In this, the buyers explained that the chief executive of both buyers had been for three weeks in the hospital; that they realized that shipping directions were overdue on the oats, but were rather surprised that the seller thought it necessary to push the matter, "inasmuch as conditions were rather bad with us at the moment." The letter then states that the seller is "the last and only shipper to whom we have not unburdened ourselves." This he proceeds to do. The unburdening consisted of elaborate statements of outstanding contracts and threatened losses arising from the wide discrepancy between contract prices and market prices, amounting to about $40,000 for each buyer, in addition to losses of from $50,000 to $75,000 already suffered within four or five months. The gist of the proposition then submitted was:

"We are not asking for cancellations, or time extensions on contracts, but wish to temporarily turn over a slice of our business

in the form of preferred stock, until such time as we can redeem same."

This preferred stock was to represent the difference between contract prices and market prices, buttressed by certain collateral agreements not now material. The buyers also inclosed financial statements showing that they were in a precarious financial situation.

On April 7, 1921, the seller answered this letter to the effect that the buyers' "proposition for us to take stock in your company in amount equivalent to the difference between the contract price and market price on our pending open contracts with you is not at all agreeable to us."

Two days later the buyers replied, stating inter alia:

"Your refusal to accept of the proposition made, if persisted in, will very likely force us to take extreme measures, which we believe is very undesirable in the present conditions, both to the shippers and ourselves. It is our desire to work out of our present difficulties, if we are given a chance by our shippers; however, if the hill is going to be made too steep and the road too rough, we cannot do it."

On April 13 the buyers wrote another letter, urging their proposition of substituted form of payment, saying:

"I am very much afraid, if you do not accept of our wishes, that it will simply place us in a position where we will throw up our hands and say quit, much as we would regret to do so. We prefer to be given an opportunity to work out of our difficulties. We have two good plants, and the grain business is coming back some day, and we want to come back with it. Will you not talk with E. R. Bacon, or with Harry Stratton, who personally know and have talked with the writer, and know our situation first hand?"

The buyers thus interposed prospective conferences in their behalf with Bacon, which prolonged the negotiations for substitute performance.

On April 16 the seller acknowledged the last two letters of the buyers, and stated that, if the proposition was that the buyers' preferred stock "is to be held by shippers merely as security, we are ready to consider such a proposition. We are not asking for preferential treatment, but we do not propose to be bound by the action of any other creditors. We are ready to enter into any reasonable arrangement that will afford us security without hampering you in your efforts to work out of your difficulties."

On April 20 the buyers referred to the previous correspondence as involving a misunderstanding, and stated that it was their intent that the shippers should take their preferred stock as security. In this letter were inclosed financial statements of the buyers as of April 1. The letter closes:

"We trust that this will make the matter clear to you, so that you will feel that you can reasonably accept of our proposition."

Parol evidence, undisputed, shows that several times during the following weeks E. R. Bacon, whose good offices had been invoked by the buyers, conferred and corresponded with the seller as to the seller's accepting the buyers' proposition. This excuses the seller for the delay in replying to the letter of April 20.

On July 18, 1921, the seller wrote:

"We presume you are rather surprised at not hearing from us at an earlier date relative to an adjustment of your open contract and indebtedness to us. We beg to advise that we have delayed in writing to you for two reasons: First, we wanted to see Mr. E. R. Bacon after his talk with you, and we rather thought that you might write us on the subject after hearing from Mr. Bacon.

"As indicated to you by Mr. Bacon, it is agreeable to us to accept in general the same arrangement you have made with others. We, however, prefer not to be stockholders in your concern, but are willing to take your notes with the stock of your concern as collateral.

"With reference to the filling of the open contract, we would much prefer to make cancellation of the entire lot and establish the loss in that manner, rather than make shipment from time to time at market value and establish the losses as we go along.

"Will you, therefore, not signify your willingness to arrive at a basis for cancellation of the entire quantity of grain due you, in this manner establishing your indebtedness to us, and, when this is done, we will accept your notes for the amount due us, with stock in your concern as collateral."

The buyers, on August 12, 1921, answered this letter and another letter of August 9 (which we do not find in the record), as follows:

"We have your letters of August 9th and July 18th, also copy of same letters from you to the Caledonia Mills, Inc., of which concern the writer is president.

"This is the first we have heard from you since April 16th, and you have not answered

our letter of April 20th, in which letter, and previous letters, we explicitly set forth just what we could do, in our estimation, with our shippers.

"In these letters we set forth definitely to you and told our other shippers that we would not give any one a preferred claim. At that time, during April, we asked Mr. E. R. Bacon to use his good offices in the matter, and ask you to join in with the other shippers.

"For your information, we would state that all the other shippers accepted this proposition, and that their goods were shipped as per contract, and settlement has been made in cash and preferred stock; this, with the exception of one firm, who have a few cars of corn to ship in later months."

Plainly this letter treats the contracts as valid and outstanding; it seeks a settlement of an admitted onerous liability. It is entirely inconsistent with the present theory that the seller was in default in failing to make seasonable tender of grain due the buyers. This was the last letter from the buyers to the seller.

On August 17, 1921, the seller wrote:

"Referring to your letter of August 12th, we believe we have already explained to you the reason for our delay in communicating further on the matter of adjusting our open contracts. Your letter of April 20th seemed to carry assurance of an amicable adjustment, which only awaited the working out of the details by Mr. E. R. Bacon, to whom you referred, to use his good offices in the matter. We had explained fully our position to Mr. Bacon, and presumed that he would take the matter up with you for adjustment. Evidently some misunderstanding has taken place, as nothing seems to have been done.

"Your letter of the 12th inst. seems to leave open no other settlement than the one you made with other creditors, which is one we do not care to enter into. We have stated positively that we would not become stockholders in your concern. At the same time, we do not ask for preferential treatment. We see no reason why our open contracts with you cannot be canceled at the market price and the loss fixed, and an agreement entered into with you whereby payments could be made in the same manner and form as those paid to other creditors, to which agreement would be attached 'preferred stock to be held as security.' This agreement can be drawn in a form giving us no greater rights than those held by other creditors.

"Unless we can have your agreement in the manner outlined, we will be compelled to ship you the grain at the original prices, and, in the event of your refusal to honor our draft, sell the same out for your account, fix our loss, and proceed to collect same in the customary manner. We would dislike taking this latter course. There is nothing preferential or objectionable in our proposition. We want to co-operate with you fully in this matter.

"Awaiting your further advices."

No answer was received to this letter. On August 27 the seller wrote again, referring to telegraphic correspondence with Mr. Bacon, and offering to accept the preferred stock in escrow, the outstanding contracts, however, to be canceled, so as to fix the loss at once.

To this letter the buyers made no reply. Letters and telegrams from the seller, requesting shipping instructions, followed. The seller then sold the grain on the market, in accordance with the custom of the trade; there is, and on this record can be, no dispute as to damages, if the contracts were outstanding.

This evidence shows conclusively that the buyers were, throughout the entire period during which otherwise they might have been required to take and pay for the goods in question, negotiating for a substitute form of payment. They were thus asking for delay. The case in that regard falls plainly under the doctrine laid down by the court in Ogle v. Earl Vane, L. R. 3 Q. B. 272 (1868), where the court said on page 279:

"The very proposal of substituted performance implies a request for delay."

[3] When, as in this case, the buyers ask for a substitution in the form of payment (really a new contract), and the seller takes their proposition under consideration, negotiating for a new arrangement less onerous to the buyers, the buyers cannot be heard to say that the delay thus caused operates as a breach or abandonment by the seller of the contract.

Rather faintly, the buyers urge that there was an issue for the jury under the evidence as to the custom in the trade. The contracts expressly provide that the shipments from Chicago should be subject to the Chicago terms. There is no dispute that the customs and usages of the Chicago Board of Trade would be, in general, applicable to the dealings between the parties. But we find nothing in the testimony of the single witness who testified as to these customs in any way inconsistent with the agreement of the parties as shown by their original contract and the correspondence and telegrams which we

have reviewed. This witness did testify that a seller must make a demand for shipping directions as a prerequisite to acquiring a right to cancel or resell for the account of the buyers. The evidence in writing is conclusive that the seller in this case did make demand for such shipping directions about September 1, 1920. The only contention, therefore, open to the buyers, was that this request was too late. But it was not too late; for the negotiations instituted by the buyers, seeking a substitute contract less onerous to them, were carried on, as indicated above, until well into August; so that the request for shipping instructions was seasonable, after failure of these negotiations. Moreover, the evidence of the single witness, who testified as to the custom, is that the obligations and rights of buyer and seller are equal; that, if the seller fails to ask for shipping directions and/or the buyer fails to give them, the contract under the Chicago usage is automatically extended. Otherwise stated, if both parties do nothing, the contract is extended. The result is that, whether we deal with the rights of the parties on the basis of their contract as shown by the writings or on the basis of the custom, the request for shipping instructions was seasonable, and there was no abandonment or breach by the seller. The contract was outstanding, broken by the buyers, and the court below was right in ordering verdicts for the plaintiff.

In each case the judgment of the District Court is affirmed, with interest and costs.