DRAINAGE DIST. NO. 1 OF LINCOLN COUNTY, NEB., et al. v. RUDE et al.

Circuit Court of Appeals, Eighth Circuit.
August 13, 1927.

No. 7732.

1. Drains ⚖═49—Legality of notice to bidders, which induced contract in suit, held not in issue, where contract was admitted.

In an action by contractors for breach of a written contract for construction of drains, validity of which was admitted by defendant, the question of legality of the notice to bidders, which induced the bid of plaintiffs, but which was not made part of the contract nor referred to therein, and was only incidentally introduced in evidence, *held* not in issue.

2. Contracts ⚖═169—In case of doubt as to meaning of language of contract preliminary negotiations, subject-matter, and surrounding circumstances may be considered to assist in determining its meaning.

In case of doubt as to the meaning of the language of a contract, preliminary negotiations, subject-matter, and surrounding circumstances should be considered, not to vary the terms or change the language of the contract, but to enable the court to determine in what sense words of doubtful meaning were used.

3. Contracts ⚖═143—To construe contract, whole thereof must be considered.

The whole contract must be considered with reference both to the nature of the obligations between the parties and their intention.

4. Contracts ⚖═155—Doubt as to meaning of contract resolved against party who prepared it.

When written contract is entirely prepared by one party and accepted by the other, any doubt as to its meaning is resolved against the party preparing it.

5. Drains ⚖═49—Provision of contract for construction of drains permitting district to increase or diminish quantities held not to authorize it to eliminate more than half the work contracted for.

In a contract by a drainage district for the construction of drains, in accordance with plans and specifications attached, which specified the quantity of construction to be done, though made on the basis of a price per unit of construction, a provision permitting the engineer of the district to "increase or diminish quantities to any extent" must be construed as meaning within ordinary and reasonable limits and not as authorizing the district to eliminate more than half the work contracted for.

6. Contracts ⚖═176(1)—Construction of contract in single complete instrument is for the court.

The general rule is that the construction of written contracts is for the court, and the rule governs where the contract is in a single complete instrument.

In Error to the District Court of the United States for the District of Nebraska; Joseph W. Woodrough.

21 F.(2d)—17

Action at law by Lewis M. Rude and Charles A. Wold, partners as Rude & Wold, against Drainage District No. 1 of Lincoln County, Neb., and others. Judgment for plaintiffs, and defendants bring error. Affirmed.

C. L. Baskins and J. G. Beeler, both of North Platte, Neb. (M. E. Crosby, of North Platte, Neb., on the brief), for plaintiffs in error.

Clarence M. Hanson, of Ft. Dodge, Iowa (Dwight G. Rider, of Ft. Dodge, Iowa, and Matthew A. Hall, Raymond G. Young, and Harvey M. Johnsen, all of Omaha, Neb., on the brief), for defendants in error.

Before KENYON, Circuit Judge, and MOLYNEAUX and JOHN B. SANBORN, District Judges.

JOHN B. SANBORN, District Judge. In this opinion, the defendants in error will be called plaintiffs, and the plaintiffs in error defendants, as in the court below. The facts out of which this controversy arose are these: The defendant drainage district, which comprises some 9,500 acres, desired to construct a system of drains to reduce the ground water level and thus prevent the accumulation of alkali near the surface of the lands. It employed an engineer, Mr. Kelly, to make the necessary surveys, prepare plans and specifications, forms for bids, instructions to bidders, and contracts. He was the "drain commissioner." The system proposed by him consisted of two main ditches, designated No. 1 and No. 2, averaging 10 feet deep, with certain branches or laterals leading into them of lesser depth. Part of the drains were open, and part were covered or tile drains. Mr. Kelly made his report to the district board in August, 1921, which contains this statement:

"It is recommended that contracts be let at this time only for drains Nos. 1 and 2, both the open and closed portions. No contract should be let for the lateral drains until after the completion of drains Nos. 1 and 2, as then definite data will be available showing whether it is desirable to change the location or capacity of the lateral drains.

"It should be clearly pointed out to the contractor that the bids on covered drains are simply for the purpose of having unit prices on which payment for covered drains will be made, as it is very probable the sizes of tiles will be changed before construction begins on the covered drains.

"Careful measurements of water developed in the open ditches should be made as

construction proceeds, as this information will indicate the capacity which should be provided in the covered drains."

Notice to bidders was published September 19, 1922. Bids were invited for constructing approximately 22.8 miles of open drains and 6 miles of tile drains, in accordance with four schedules. Schedule No. 4, with which we are concerned, related to "hauling tile, excavating, laying, and backfilling complete in place 31,900 feet of tile drain varying in size from 8 inch to 24 inch, average depth from 7 to 8 feet." The notice stated that instructions for bidders, proposal blanks, plans, and specifications, form of contract, and other instructions could be obtained from the drain commissioner, and that sealed bids would be received up to 1 o'clock in the afternoon of October 23, 1922. The instructions to bidders required that they satisfy themselves, by personal inspection, of the nature of the work; that they make bids upon one or more schedules; that every item in each schedule upon which a bid was made should be bid upon; and stated that bids would be considered upon the approximate quantities shown by the plans and specifications on file; that consideration would be given to the basis of aggregate cost as well as to separate schedules; that character and ability would be considered; that all proposals would be received with the express understanding that the bidder accepted the conditions contained in the instructions, specifications, contract, and bond referred to therein; that, "if any difference of opinion shall arise as to the true intent and meaning of the specifications or plans, after proposals have been delivered to the drain commissioner, the decision of the district engineer shall be final"; that "work on schedule No. 4 cannot be started until sufficient work has been done on schedules 1 and 2 to provide outlets for the tile drains." Prior to the receipt of bids, schedule No. 4 was changed, increasing the length of the tile drains to be laid and providing for 9 lines of tile drains, totaling 86,518 feet. The change was made on October 21st, and Mr. Kelly sent out a supplemental statement to bidders showing it. He claims that he orally stated to prospective bidders that, while bids were to be received upon the changed schedule, it was with the understanding that it was proposed to construct only the tile lines on drains No. 1 and No. 2, 2F and 2F1—about 37,900 feet—and that the construction of the other laterals would depend upon the necessity for them. The plaintiffs deny that any such statement was made to them. Their bid on schedule No. 4, as shown by the contract, was:

"Furnishing all labor and materials excepting drain tile and sewer pipe for covered drains complete in place:

| Size Drain | Unit Price Per Foot |
|---|---|
| 8″ | $0.61 |
| 10″ | $0.62 |
| 12″ | $0.63 |
| 15″ | $0.66-5 |
| 18″ | $0.70 |
| 20″ | $0.72 |
| 22″ | $0.75 |
| 24″ | $0.78 |

"42 manholes of concrete @ $70.00 each.

"5 outlet structures of concrete @ $75.00 each.

"Furnishing gravel in place around tile, if required, $3.00 per cubic yard.

"Furnishing cradles or supporting timbers in place under tile, if required, @ $200.00 per M., F. B. M."

—which totaled, according to the plans and specifications, $63,037.23. The bid was accepted. The contract was made January 12, 1923. It provides for the plaintiffs' doing the work within 360 days from the time they commence, and for a penalty of $50 a day for every day thereafter their work remains unfinished; that the sum mutually agreed to be paid for the work is $63,037.23 in cash "provided the amount of work done and material furnished is the same set out in the proposal"; that payments shall be made in monthly installments, the district to retain 15 per cent., and that final payment shall be made within 30 days after the completion of the contract; that the district employs the contractor to do the work "according to the terms and conditions herein contained and referred to, for the price aforesaid, and hereby contracts to pay the same at the time, in the manner, and upon the conditions set forth." The plans and specifications are, by reference, made a part of the contract, but not the notice to bidders. The specifications contain these provisions:

"11. The contract to cover the work to be done will be based upon the proposal, these specifications, and the plans to which they refer, which will be attached hereto and form a part hereof. Should any discrepancy exist between the plans and specifications or any part of either, or should the language of any part of the same be ambiguous or doubtful, the engineer shall decide as to the true intent and meaning of the same."

"13. The engineer or his authorized representative shall at all times have full control and direction of all work under the contract, and all questions, dispute or differences as to any part or detail thereof shall be decided by such representative."

"24. The drain commissioner of the district, acting for the district, reserves the right to make any desired changes in the alignment or location of the drains, to exclude any item, to increase or diminish the quantities to any extent, and to increase or decrease the cut over that shown on the profile; the extra yardage or extra work to be done to be paid for or deducted at the unit price bid. Such alterations or reductions shall not vitiate or annul the contract or agreement hereby entered into."

"25. The quantities given are only approximate and the actual quantities may vary widely from those given, these being the purpose of obtaining a unit price on which to work."

"75. In case it becomes necessary during the construction of the drainage system to construct extra lengths of drain lines, accessories, or structures, additional over and above the amounts advertised, the contractor shall construct the same upon the written order of the engineer, and shall be paid for such work at the same rate as bid for similar items or at the rate of actual cost, plus 10 per cent., if on some item upon which no unit price has been stated. The right is reserved by the drain commissioner of said drainage district No. 1 of Lincoln county, Neb., to reduce the quantities, to exclude any items, or to make any changes in the dimensions or locations of the drain or drainage structures, providing written notice is given to the contractor before he has delivered the necessary materials for the construction upon the ground, and to make deductions from payments under the contract at the rate of unit price agreed upon for such work."

On November 18, 1924, Mr. Elliott, who had replaced Mr. Kelly as drain commissioner and was the engineer in charge of the work, wrote the plaintiffs that open drains Nos. 1 and 2 would be completed in December, and that they would be expected to start the tile work as early in the spring as possible; that "there will be about 7½ miles of tile work to be installed under your contract, and we hope that you will be able to get started not later than the 1st of April, 1925." On December 2, 1924, the plaintiffs wrote Mr. Elliott, stating that they would begin work as early in the spring as conditions would permit, and also stating:

"We note you speak of 7½ miles of tile drain, and in this we believe you are in error. As we recall it, there is approximately 16 miles of work for us to do."

On December 8th, Mr. Elliott replied as follows:

"Your letter of the 2d at hand and glad to note your readiness to start work in the spring.

"Concerning the 7½ miles mentioned in my recent letter of November 18:

"While there is 16 miles of tile drains embodied in the original plans, all of which may eventually be needed, the results of the work already installed may indicate necessary material changes in the location of the smaller laterals, and until such results are definitely determined it is the plan of the board at the present time to install only those tile lines that constitute the upper parts of drains No. 1 and No. 2, amounting to approximately 4 miles on one and 3½ on the other.

"This was not explained in my letter of November 18th, owing to the fact that I was under the impression that the plan just outlined was explained to Mr. Rude when he was out here this last summer."

To this letter there was no response, and Mr. Wold denies having seen it. Mr. Wold was upon the ground March 29, 1925, with men and equipment to start the work. He had a trench machine, which it was found was not efficient in digging the deep main ditches for the placing of the 24-inch tile, and a "drag line" was procured about June 11th. About June 1st, Mr. Wold had told Mr. Elliott that he had sent for the drag line, that he wanted to use it on the deep work on the main ditches, and to use the trench machine on the branches. Mr. Elliott told him that all the branches except two were cut out. Mr. Wold stated that they were a part of the contract and that they expected to put them in. The plaintiffs had several other ditch-digging machines that they could have put to work and which it was necessary for them to put to work if the contract was to be performed within the time specified. They demanded tile for the branches, but none was furnished. In July, the plaintiffs' attorney came down, and on July 29th went to Mr. Elliott's office and demanded that tile be furnished for the branches so that the additional equipment could be used. Mr. Elliott stated that the branches would not go in at that time and possibly not for years. The trench machine was idle for three weeks. Tile was being furnished for the main ditches being dug by the drag line, but no tile for more than the 7½ miles of drain referred to in Mr. Elliott's letter. On August 15th, the plaintiffs served notice on the district, demanding that it furnish tile for the designated branches or tender a statement that tile had been ordered. They tendered full performance of the contract on their part. They were told

that tile would not be furnished for the branches. They ceased putting in any further tile, but backfilled the ditches where tile had been laid. They then brought suit against the defendants for $25,000 damages for breach of the contract, and for $3,520.89 which they claimed was due them for work performed and money retained by the district up to·August 24th.

The petition set out the contract—but not the notice to bidders, the bid, the instructions to bidders, or plans and specifications—alleged its breach by the district, the plaintiffs' partial performance of the contract, their damages, and the amount due for the work done. The defendants filed a general demurrer, which was overruled. They answered admitting the contract, but alleging that it was not completely set out in the petition; that under it they had a right to reduce the amount of construction which it ostensibly called for; that they had not breached it, but that the plaintiffs had. At the trial the defendants objected to the introduction of any evidence, on the ground that the petition stated no cause of action, which objection was overruled. The plaintiffs proved the contract, the facts claimed to constitute its breach by the district, their damages, and the amount due them and unpaid for work performed. The defendants, at the close of the plaintiffs' case, moved for a directed verdict, which motion was denied.

The defendants' testimony, so far as it bears upon any question presented here, tended to show that the plaintiffs were advised, both before they bid and before they commenced the work, that only 7½ miles of drain line might be put in; and that, while engineers understood the customary clauses in contracts such as this, permitting changes in quantities, to refer to necessary or desirable minor changes, the clauses used in this contract were unusual, and they thought would permit more drastic changes. It seems that Mr. Kelly obtained these provisions from a printed form, which he amended. Paragraph 25 varied from the printed form to the extent of the word "widely," so that it read, "The actual quantities may vary widely from those given." In paragraph 24 he added to the printed form the words "to any extent," so that it provided that the drain commissioner might increase or diminish the quantities "to any extent."

At the close of all the testimony, the plaintiffs moved for a directed verdict for the least amount which the evidence showed that they were entitled to, and the defendants requested certain instructions to the effect that, if the jury found that the paragraphs of the contract referring to changes were not standard forms generally found in specifications, that they do authorize changes to any extent of the amount of construction, and that, prior to entering into the contract, the plaintiffs were informed by the district that it might not have constructed more than the two main tile drains and two laterals, the refusal to furnish the tile for the other branches was not a breach of the contract. The defendants' requests were denied, and the court directed a verdict for the plaintiffs for $24,722.08, being the least amount the evidence showed they were entitled to.

The case is here by writ of error. Numerous errors are assigned, but only three questions are argued. We are asked to decide: (1) Whether the complaint stated any cause of action; (2) whether the contract permitted a reduction of the amount of work from approximately 16 miles to approximately 7½ miles; (3) whether the question of the construction of the contract was for the jury.

[1] The defendants argue that in some way the question of whether the notice to bidders complied with section 1797 of the Compiled Statutes of Nebraska 1922, is before this court. The notice to bidders is no part of the contract, and is not referred to in it nor in the plans and specifications. The only reason that it got into the record is that the court refused to permit the plaintiffs to introduce the contract in evidence without the notice to bidders and the other documents that were physically attached to it. The plaintiffs excepted to the ruling of the court in that regard, so that it was not a question which was voluntarily litigated. The question was certainly out of reach of the demurrer, which had the effect of admitting all of the allegations of the petition. The answer specifically admitted the contract, and in the court below, throughout all the proceedings, the position of the defendants was that the contract was valid and that it permitted the defendants to do what they did do—reduce the amount of construction. The question is clearly not before us. Pullman's Palace Car Co. v. Central Transp. Co., 139 U. S. 62, 11 S. Ct. 489, 35 L. Ed. 69; Badger v. Ranlett, 106 U. S. 255, 1 S. Ct. 346, 350, 27 L. Ed. 194; Union Trust Co. v. Illinois Midland R. Co., 117 U. S. 434, 6 S. Ct. 809, 29 L. Ed. 963.

The petition virtually stated two causes of action—one for damages for breach of contract; the other for a balance due and owing for work done under a contract. If, upon the facts stated, under any theory the

plaintiffs could have recovered anything, the demurrer could not have been sustained. The court was clearly right in overruling it.

The defendants on the two remaining questions state their position as follows: "Where a contract by its plain terms would allow of any changes or alterations, the question as to whether or not such terms of the contract amount to an emasculation of the contract or whether the contract explains the intent of the parties depends upon the situation of the parties at the time when their contract was made, its subject-matter, and the purpose of its execution, and the question as to the situation of the parties, the subject-matter of the contract, and their intention in entering into the contract as made, is a question of fact for the jury when the evidence is in dispute."

The record and, in fact, the instructions requested by the defendants show that there were two disputed questions in this case: (1) Whether the plaintiffs were notified before they made the contract that the district would claim the right to reduce the amount of construction called for; and (2) whether the language used in the contract means what the defendants claim it does or not.

[2] Where written contracts fail to express the agreement upon which the minds of the parties actually met, by reason of fraud or mutual mistake, equity affords a remedy by way of reformation. Courts of law must enforce written contracts according to the language used by the contracting parties, giving, however, to such language a rational interpretation and one which will, so far as possible, effectuate their mutual intention, and not defeat the object and purpose sought to be accomplished. The intention of the parties as expressed by, and not divorced from, their language, is what a court must seek to discover in construing a contract. It is elementary, of course, that, where language is plain and its meaning clear, there is no room for construction. In cases of doubt, however, as to the meaning of the language of contracts, preliminary negotiations, subject-matter, and surrounding circumstances should be considered, not to vary the terms or change the language of the contract, but to enable the court to determine in what sense words of doubtful meaning were used. Smith v. American Nat. Bank (C. C. A.) 89 F. 832; Knowlton v. Oliver (C. C.) 28 F. 516; E. H. Stanton Co. v. Rochester German Underwriters' Agency (D. C.) 206 F. 978, 983; Great Northern Ry. Co. v. United States (C. C. A.) 236 F. 433, 440; Crimp v. McCormick Const. Co. (C. C. A.) 72 F. 366;

Cramp & Sons Ship & Engine Building Co. v. Sloan (C. C.) 21 F. 561; Mobile & Montgomery Ry. Co. v. Jurey et al., 111 U. S. 584, 592, 4 S. Ct. 566, 28 L. Ed. 527; Christian v. First Nat. Bank of Deadwood (C. C. A.) 155 F. 705, 709; Salt Lake City v. Smith (C. C. A.) 104 F. 457.

[3] It is also a rule that the whole contract must be considered and interpreted with reference both to the nature of the obligations between the parties and the intention as manifested in forming them. O'Brien v. Miller, 168 U. S. 287, 18 S. Ct. 140, 42 L. Ed. 469.

[4] It must also be kept in mind that, when a written contract is entirely prepared by one of the parties, and accepted, as thus prepared, by the other, any doubt as to the meaning of its provisions is to be resolved against the party preparing it. Wilson v. Cooper (C. C.) 95 F. 625; Van Zandt v. Hanover Nat. Bank (C. C. A.) 149 F. 127; Christian v. First Nat. Bank of Deadwood, supra; Noonan v. Bradley, 9 Wall. 394, 407, 19 L. Ed. 757; Texas & Pacific Ry. Co. v. Reiss, 183 U. S. 621, 626, 22 S. Ct. 252, 46 L. Ed. 358; Bijur Motor Lighting Co. v. Eclipse Mach. Co. (D. C.) 237 F. 89; Crowley Co. v. Clark Equipment Co. (C. C. A.) 263 F. 58.

[5] Provisions in contracts made by municipalities and others, calling for a definite quality and quantity of construction, and permitting changes by way of reduction and increase, have received judicial interpretation, so that their meaning is now well understood, as is shown by the testimony of the engineers in this case. In Salt Lake City v. Smith, supra, this court said of them (page 466):

"The customary provisions in such contracts that the corporation or its engineer may make any necessary or desirable alterations in the work, and that the contractors shall receive the contract price or a price fixed by the engineer for the work or materials required by the alteration, is limited in the same way, by the intention of the parties when the contract was made, to such modifications of the work described in the contract as do not radically change its nature or its cost. Material quantities of work required by such alteration, that are substantially variant in character and cost from that contemplated by the parties when they made their agreement, constitute new and different work, not governed by the agreement for which the contractors may recover its reasonable value" —citing Cook County v. Harms, 108 Ill. 151; Henderson Bridge Co. v. McGrath, 134 U. S. 260, 10 S. Ct. 730, 33 L. Ed. 934; City of Elgin v. Joslyn, 136 Ill. 525, 26 N. E. 1090;

Sexton v. City of Chicago, 107 Ill. 323; Kirk v. Manufacturing Co., 118 Ill. 567, 8 N. E. 815; Chicago & G. E. Ry. Co. v. Vosburgh, 45 Ill. 311; Western Union R. Co. v. Smith, 75 Ill. 496. See, also, McMaster v. State, 108 N. Y. 542, 15 N. E. 417; Kieburtz v. City of Seattle, 84 Wash. 196, 146 P. 400; Tribble v. Yakima Valley Transp. Co., 100 Wash. 589, 171 P. 544; National Contracting Co. v. Hudson River Water Power Co., 192 N. Y. 209, 84 N. E. 965; Board of Directors of Plum Bayou Levee Dist. v. Roach et al. (C. C. A.) 174 F. 949, 953.

The reluctance of the courts to extend the meaning of such provisions so as to give the right to make such changes as are contended for here is natural. If municipal corporations may enter into contracts calling for definite construction and are then permitted to reduce or increase the amount of construction to any extent they see fit, all the safeguards thrown around the making of such contracts become futile; the contract can only be let at an excessive figure, because no contractor can tell how many men or how much equipment or material to furnish, or whether he will be called upon to do the most or the least profitable work involved, and the door is completely open to manipulation and fraud. In this case, if the drainage district was merely employing the plaintiffs to lay tile at so much per foot, without regard to quantity—which is, in substance, what it claims—language could easily have been employed to express that intention, and no one could have been misled or injured. But it did not do that. It specified a certain quantity of construction to be done, and, after letting the contract, claimed the right, by virtue of its provisions, to eliminate some five-eighths of it. Taking the contract as a whole, the circumstances under which it was made, and the object to be accomplished, and reading its provisions in the light of the judicial interpretation of similar provisions of construction contracts, we reach the conclusion that its language is not susceptible of the interpretation claimed for it by the defendants. It may be that the district should not have made the contract that it did, but that is no fault of the plaintiffs. Having made it, the district had the choice of carrying it out or paying damages for its breach.

[6] The defendants claim that the meaning of the language of the provisions in question should have been left to the jury. The general rule is that the construction of a written instrument belongs to the court. 6 R. C. L. 862; Goddard v. Foster, 17 Wall. 123, 21 L. Ed. 589; Scanlan v. Hodges (C. C. A.) 52 F. 354; Brown v. J. C. Shaffer Grain Co. (C. C. A.) 15 F.(2d) 514; Burrows & Kenyon v. Warren (C. C. A.) 9 F.(2d) 1. In General Motors Corporation v. Abell (C. C. A.) 292 F. 922, 926, the court said:

"The court cannot devolve its duty of construing written instruments upon the jury merely because its performance involves possible difficulty. Special findings inconsistent with the legal construction of writings must be disregarded."

In Scanlan v. Hodges, supra, Judge Caldwell of this court said (page 359):

"Undoubtedly, the general rule is that the question whether given written instruments constitute a contract, as well as the interpretation of such written instruments when it is determined that they do constitute a contract, belongs to the court, and not to the jury; and this rule is as applicable to commercial correspondence as to a formal written contract. Brown v. McGran, 14 Pet. 479, 494, 495 [10 L. Ed. 550]; Turner v. Yates, 16 How. 16, 23 [14 L. Ed. 824]; Drakeley v. Gregg, 8 Wall. 242 [19 L. Ed. 409]; Goddard v. Foster, 17 Wall. 123, 142 [21 L. Ed. 589]. Exceptional cases arise where the contract rests partly in correspondence and partly in oral communications, in which it is held that the question whether or not there is a contract is a question for the jury; but this is not one of those cases.

"In the construction of a written contract, the court may consider the relation of the parties to the contract and its subject-matter; in other words, the court is not denied the same light and information the parties enjoyed when the contract was entered into."

There are cases in which the interpretation of the language of a contract is a question of fact for the jury. In Brown v. McGran, 14 Pet. 479, 493 (10 L. Ed. 550), Mr. Justice Story said:

"There certainly are cases in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury, for the purpose of carrying into effect the real intention of the parties. This is especially applicable to cases of commercial correspondence, where the real objects, and intentions, and agreements of the parties are often to be arrived at only by allusions to circumstances which are but imperfectly developed."

See, also, Etting v. Bank of United States, 11 Wheat. 59, 6 L. Ed. 419; Rankin v. Fidelity Trust & S. D. Co., 189 U. S. 242, 253,

23 S. Ct. 553, 47 L. Ed. 792; dissenting opinion in Ætna Indemnity Co. v. J. R. Crowe Coal & Mining Co. (C. C. A.) 154 F. 545.

In this case the agreement is in writing and is complete. The prior statements and negotiations of the parties are merged in the agreement. Brawley v. United States, 96 U. S. 168, 173, 24 L. Ed. 622; Simpson v. United States, 172 U. S. 372, 19 S. Ct. 212, 43 L. Ed. 482; Sells v. City of Chicago, 229 U. S. 616, 33 S. Ct. 616, 57 L. Ed. 1353; Parks & Co. v. Howard Hotel Realty Co. (Iowa) 203 N. W. 247; Zack v. Gans (Sup.) 128 N. Y. S. 737; Rosenberg v. Kazemier, 79 Misc. Rep. 44, 138 N. Y. S. 1070. There is no substantial dispute as to material facts and circumstances surrounding the making of the contract. The provisions used, or ones similar to them and having substantially the same meaning, have received judicial construction and are recognized as referring to changes which do not materially alter the work contracted for. We think it is clear that there was no question of fact to be submitted to the jury.

The judgment is affirmed.