### DE JUR–AMSCO CORP. v. FOGLE.
### Civ. No. 139–51.

United States District Court,
D. New Jersey.

Feb. 26, 1954.

Harry B. Rook, Newark, N. J., Maxwell James, New York City, for plaintiff.

William J. Weliky, Newark, N. J., for defendant.

MEANEY, District Judge.

This is a suit brought by the plaintiff, DeJur-Amsco Corporation, against Marlin E. Fogle for a declaration that it is the owner of a patent application of the defendant, now Fogle's Letters Patent No. 2,584,440 for an exposure meter. The defendant, denying the claim of the plaintiff, seeks a dismissal of the complaint and counterclaims asking (1) for an accounting for all exposure meters manufactured and sold by the plaintiff during the period of its employment of the defendant, and payment of certain royalties; (2) an accounting for all such meters manufactured and shipped by the plaintiff which embody features covered by defendant's patent No. 2,-584,440, and recovery of royalties thereon; (3) damages occasioned the defendant by reason of what the defendant terms fraudulent conduct on the part of the plaintiff in provoking baseless interference proceedings, purposely prolonging them and otherwise causing financial loss to the defendant by the institution of the present suit as part of a fraudulent purpose to deprive the defendant of his rights to his patent and its exploitation. The determination of the suit must depend largely on the construction of an employment agreement between the two parties to this action. Whatever factual questions may arise were testified to at an interference proceeding in the Patent Office affecting the suit patent No. 2,584,440, and at the trial held before this court on September 15, 1953.

The plaintiff for many years has been a manufacturer of electrical and mechanical apparatus, part of its operation being concerned with the field of photography. Among its products were what are known as exposure meters, for calculating the time of exposure of a film according to the light at the time of photographing. The defendant is a person of admitted skill and experience in various fields including electrical and electro-chemical engineering, mathematics and physics. In April, 1945, the parties entered into an agreement which they have stipulated is contained in three letters dated April 18, April 24,

and April 27, 1945. These letters are attached to and made part of the complaint as Exhibit 1. The agreement was for the period of one year, renewable on its expiration by mutual consent. At the expiration of the agreement there was no formal renewal but the relationship between the parties was continued until mid-September, 1946, when a new agreement was entered into, in which the defendant became an engineering consultant.

Under the terms of the original agreement the defendant was employed as chief engineer in charge of electrical instruments at a yearly salary of $10,000 plus further compensation set forth in the letter of April 18th. He was to enter his employment within approximately six weeks from April 18th. The further compensation was to consist of (1) the payment of two cents on each exposure meter currently manufactured and shipped by the plaintiff company except those for government or war agencies, and these payments were to begin immediately on the commencement of his duties with the company; (2) the payment of seven cents on each exposure meter manufactured and sold by the company on new models made and produced after the defendant's entry into the company's employ. This sum was to be paid for a period of five years from the date of production of these units, and in the event of the death of defendant during such period, the seven cents per meter on such new models was to be paid to his wife for the remaining period.

The agreement went on to include the following provisions:

"3. It is further understood that in the event of termination of your employment with us, that the compensation of seven (7¢) cents per exposure meter on such units resulting from designs originating during your employ with us will continue only on exposure meters that embody features of your con-

tribution and that have been covered by patents."

The agreement makes no specific mention of the question of ownership of patents which may be involved in the meters, or any assignment thereof.

The defendant actually entered the employment of the company on May 22, 1945. That date becomes especially important in view of the fact that one day earlier (May 21, 1945) the defendant Fogle prepared and made a disclosure of the idea of a "baffle system" which automatically moved the calculator plate for a dual range meter. A patent was later obtained by Fogle after he had been in the employ of the plaintiff company, and there are indications in the testimony that he and various others in the employ of the plaintiff company had worked out the mechanical details of the baffle system. But the fact remains that the patent was issued to the defendant upon testimony in interference proceedings which were resolved in favor of the defendant, after an attempted abandonment of contest by the plaintiff.

The ultimate question for this court to answer is whether in the light of these considerations the patent issued to the defendant belongs to the plaintiff and should be assigned to it.

■ Against the actual issue of the patent to the defendant and its accompanying presumptions, the plaintiff argues that, by reason of the agreement heretofore mentioned, the defendant was legally bound to turn over to it the entire result of his activities in the field of exposure meters and their development, from and after the date of April 27, 1945, when the last letter of the three comprising the agreement was signed. It advances the contention that the fact that Fogle made his significant disclosure one day before assuming his duties with the plaintiff company in nowise releases him from the obligation which it alleges he had, to turn over all the fruits of his operations under the agreement. The theory behind its claim

is that since the defendant knew the terms of the contract and even before written acceptance thereof had assented to its terms, therefore whatever he did thereafter was in contemplation of the work he was to perform for the plaintiff. If this be true, there might be basis for argument in the plaintiff's favor. But here we must come back to the agreement itself and its legal significance. The original letter was prepared by the president and vice-president of the plaintiff company, and if there be any ambiguity in its terms the responsibility is theirs; the language thereof is to be construed against the framers thereof. Sonotone Corp. v. Hayes, 1949, 2 N.J.Super. 407, 64 A.2d 249.

In the present instance the construction of the agreement in an important aspect depends on the meaning to be attached to subsections 2 and 3 of paragraph II. The plaintiff urges that the two subsections must be read together in order to make subsection 3 intelligible, especially referring to the use of the word "the" when speaking of compensation of seven cents, and to the use of the words "such units." It insists that the two subsections when read together provide that compensation of seven cents is to be made only on new models of exposure meters "resulting from designs originating during your employ with us * * * that embody features of your contribution and that have been covered by patents", and in effect says that subsection 3 merely provides for the continuance of the seven cent payment on termination of the defendant's employment and continues that compensation even after termination of employment, limiting it to a period of five years from the date of production.

The defendant's position is that subsection 3 of paragraph II must be read to the effect that the payment of seven cents mentioned therein constitutes a royalty on all units resulting from designs originating during his employ on exposure meters embodying features of his contribution *and that have been covered by patents.* (Emphasis supplied).

There is no doubt that the plaintiff knew of the background of the defendant before it employed him and was aware of his familiarity with the manufacture and production of exposure meters. Otherwise it would never have contemplated engaging him as chief engineer in charge of electrical instruments.

Taking an overall view of the picture presented by the discussions antecedent to the making of the agreement (Exhibits P 40 and D 20) and the language of the letters themselves, it would seem to the court that subsection 3 of paragraph II in the contemplation of the parties provided for payment of royalties, and that the limitation of five years set forth in subsection 2 of paragraph II did not attach to the payment of royalties which were to have been for the life of the patent. The lack of specificity in the language is due to the choice of words of the person who prepared the document, in this case the plaintiff. The court has followed the general rule of resolving whatever doubts may arise from the wording of the agreement in favor of the person with whom the drawer of the instrument dealt. Drainage Dist. No. 1 v. Rude, 8 Cir., 1927, 21 F.2d 257; E. I. Dupont de Nemours & Co. v. Claiborne-Reno Co., 8 Cir., 1933, 64 F.2d 224, 89 A.L.R. 238.

The further claim of the plaintiff that it is the true owner of the Fogle patent is based on the contention hereinbefore referred to, that by the contract of Fogle's employment he was bound to turn over to his employer all of the fruits of his endeavors, including any patent he may obtain. The defendant answers with the assertion that the disclosure of his invention was made before he actually entered the plaintiff's employ, and that there was a royalty arrangement included in his agreement, which negatives the plaintiff's position. He further insists that under no proper interpretation of the agreement could the plaintiff be entitled to an assignment

of the patent in the absence of an express agreement to that effect. Both parties cite the case of United States v. Dubilier Condenser Corp., 1933, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, as a basis for their position. But with the conclusions hereinbefore arrived at, the court is of the opinion that the Dubilier case presents support for the defendant's contentions rather than those of the plaintiff. And since the agreement has been construed to include an arrangement for royalties, there can be no question of "shop rights."

Defendant points to the fact that from May, 1946, when plaintiff demanded an assignment of the patent, until the filing of the complaint in the present action in February, 1951, plaintiff did nothing to pursue any rights of ownership it may have had, and is thereby estopped now from claiming a right to assignment of the patent. Viewing the record as a whole, however, the court is not satisfied that plaintiff's failure to act constituted other than the possibility of laches not sufficient in itself to foreclose plaintiff from asserting the claim it has alleged in the complaint.

In view of the foregoing, the complaint is dismissed with costs against the plaintiff. With regard to the counterclaims, it is ordered that the plaintiff account to the defendant for payment of two cents per meter under paragraph II, subsection 1, of the agreement; that it also account for the payment of royalties as set forth in the second counterclaim.

Despite this finding, after consideration of the testimony and the documentary evidence, the court is not satisfied of definite fraudulent intent on the part of the plaintiff either in the interference proceedings or in the institution of the present suit. Accordingly, the third counterclaim based on the claim of fraud is dismissed without costs. There will be no counsel fee as prayed for by the defendant.

Let an order in conformity with these findings be submitted.